**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GERSON NUNEZ,
          *Plaintiff-Appellant,*

v.

DR. DUNCAN, Officer at FCI; GARY
L. ANGUS, Ex-Counselor at FPC-
Sheridan, now FCI; MIKE SANDELS,
Camp-Administrator at FPC-
Sheridan; JOHNSON, Lieutenant at
FCI; GENDREAU, Lieutenant at FCI;
EX-CAPTAIN SMITH, at FCI; ROBERT
HOOD, Ex-Warden at FCI; CHARLES
A. DANIELS, at FCI; ROBERT M.
HARO, Central Regional; HARREL
WATTS, Central Office
Washington, DC; WANDA M.
HUNT, Chief, FOIA; PRISCILLA
JONES, Administrative Specialist
FOIA,
          *Defendants-Appellees.*

No. 04-36146

D.C. No.
CV-03-01359-ALA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted
May 6, 2009—Portland, Oregon

Filed January 11, 2010

751

Before: William A. Fletcher and Sandra S. Ikuta, Circuit Judges, and Michael Seabright,* District Judge.

Opinion by Judge William A. Fletcher;
Dissent by Judge Ikuta

---

*The Honorable J. Michael Seabright, United States District Judge for the District of Hawaii, sitting by designation.

## COUNSEL

Banurekha Ramachandran, PERKINS COIE, LLP, Portland, Oregon, Gerson Nunez, Pro se, Anchorage, Alaska, for the appellant.

Margaret M. Ogden, FEDERAL BUREAU OF PRISONS, SeaTac, Washington, Amy Potter, Suzanne Bratis, Adrian Lee Brown, OFFICE OF THE US ATTORNEY, Portland, Oregon, for the appellees.

## OPINION

W. FLETCHER, Circuit Judge:

Federal prisoner Gerson Nunez filed a pro se *Bivens* complaint alleging various constitutional claims arising out of an unconsented strip search. The district court granted summary judgment for defendants. Nunez contends on appeal that his Fourth and First Amendment claims were improperly dismissed.

The district court recognized that Nunez had asserted a Fourth Amendment claim but dismissed it for failure to exhaust administrative remedies under the Prison Litigation Reform Act ("PLRA"). In the alternative, the district court held that the claim failed on the merits. We hold that Nunez's failure to exhaust his administrative remedies is excused. We hold that Nunez's Fourth Amendment claim fails on the merits.

The district court read Nunez's complaint as not alleging a First Amendment claim. Nunez's appointed counsel on appeal contends that, read fairly, his complaint contains such a claim. We assume without deciding that Nunez alleged a First Amendment claim, but we hold that he failed to exhaust his administrative remedies with respect to that claim.

## I.   Background

### A.   Events Giving Rise to the Complaint

The federal prison in Sheridan, Oregon consists of three separate facilities: the Federal Detention Center, an administrative facility primarily housing pretrial inmates; the Federal Prison Camp ("FPC"), a minimum security satellite prison camp; and the Federal Correctional Institution ("FCI"), a medium security prison. At the times relevant to this suit, Nunez was housed in the FPC.

Beginning in October 2001, Nunez was assigned to work the night shift of an orderly work crew. Nunez presented evidence showing that in May 2002, when he and three other inmates were returning to the FPC from a work detail at the FCI, he was subjected to a strip search by Correctional Officer Eric Duncan. Duncan asked the returning inmates to choose a number between one and ten. Nunez chose four. Duncan said that his number was five, that Nunez's number was closest, and that Nunez was the winner of the "raffle strip search." Nunez was then subjected to a strip search in the men's bathroom two feet away from the urinals, during which he was obliged to stand barefoot on the dirty floor.

### B.   Exhaustion of Administrative Remedies

Before filing his *Bivens* suit, Nunez took steps to exhaust his administrative remedies. We first describe the grievance procedures established by the federal Bureau of Prisons ("BOP"). We then describe Nunez's attempts to follow those procedures.

#### 1.   Governing Regulations

The BOP grievance process is set forth at 28 C.F.R. § 542.13-.15. As a first step in this process, an inmate normally must present his complaint informally to prison staff

using a BP-8 form. If the informal complaint does not resolve the dispute, the inmate may make an "Administrative Remedy Request" concerning the dispute to the prison Warden using a BP-9 form.[1] The BP-8 and BP-9 are linked. Both forms involve a complaint arising out of the same incident, and both forms must be submitted within 20 calendar days of the date of that incident. 28 C.F.R. § 542.14(a). An extension of time is available upon a showing of valid reason for delay. Section 542.14(b) provides a non-exhaustive list of reasons that justify an extension of time. Valid reasons "include . . . an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal." *Id.*

If the Warden renders an adverse decision on the BP-9, the inmate may appeal to the Regional Director using a BP-10 form. 28 C.F.R. § 542.15(a). The BP-10 must be submitted to the Regional Director within 20 calendar days of the date of the Warden's decision. *Id.* As with the time period for filing a BP-9, an extension of time is available upon a showing of a valid reason. *Id.* Section 542.15(a) provides that "[v]alid reasons for delay include those situations described in § 542.14(b)." *Id.*

The inmate may appeal an adverse decision by the Regional Director to the Central Office (also called the General Counsel) of the BOP using a BP-11 form. *Id.* The BP-11 must be submitted to the Central Office within 30 calendar days from the date of the Regional Director's decision. *Id.* As with the time period for filing a BP-9 and a BP-10, an extension is available upon the showing of a valid reason as described in § 542.14(b). *Id.*

---

[1] If a complaint is "sensitive," such that "the inmate's safety or well-being would be placed in danger if the Request became known at the institution," the inmate may bypass the Warden and file a BP-9 directly with the BOP Regional Director. 28 C.F.R. § 542.14(d).

## 2. Nunez's Attempts to Exhaust His Administrative Remedies

### a. Fourth Amendment Claim

The strip search to which Nunez objected took place on May 13, 2002. Nunez filed an informal complaint using a BP-8 the next day, alleging that Duncan had violated his Fourth Amendment rights in conducting a raffle strip search. After describing the strip search, Nunez wrote:

> The interest in human dignity and privacy which the Fourth Amendment protects forbid any searches involving intrusions beyond the body's surface on the mere chance of a lottery amusement; in the absence of a clear indication that the inmates had any contact with an outsider, nor any clear indication that in fact any evidence will be found. These fundamental human interests require Officer Dunkin [sic] to suffer the risk to be liable in his personal capacity under Bivens Act; and, because Officer Dunkin [sic] claimed to be following superior order, his superiors would also be liable in their personal capacities.

Nunez also wrote that he was requesting "which law or statutory rule [Correctional Officer Duncan] was acting under" when he conducted the search.

On May 16, Correctional Counselor Gary Angus denied Nunez's BP-8. He wrote:

> Inmates who pass through the lobby are subject to pat searches and random visual (strip) search[e]s. This is in the Post Orders for all officers who work this post to follow. [Duncan] choose [sic] to make it fair to the inmates present to select random numbers so all there would share a chance at being searched.

On May 23, Nunez filed a follow-on BP-9 with the Warden. Nunez wrote:

> [I]nmate Nunez filed a BP-8 requesting proper notice of the law and BOP's regulations under which Sheridan's Lieutenants enforce strip searches without violating the constitutional limits. The BP-8's response is out of the subject matter of inmate Nunez's request. One more time, inmate Nunez wants the staff's proper notification under which law or statutory rule officers Duncan, Gendreau were acting under while performing strip searches under color of federal law.

The Warden responded on June 7. He characterized Nunez's BP-9 as merely a request for a citation to the regulation under which Duncan had been acting, even though the prison was clearly on notice that Nunez was also questioning the constitutionality of the search under the Fourth Amendment. The Warden wrote:

> Sheridan staff are following Bureau of Prisons policy as outlined in Program Statement 5500.09, chapter 6, page 5, paragraph D. This policy mandates searching inmates entering or leaving the front entrance of institutions. This policy also mandates that visual searches be conducted periodically.

At the bottom of the form on which the Warden responded was printed a notice informing Nunez that, "If dissatisfied with this response, you may appeal to the Regional Director."

The government concedes that the Warden cited the wrong BOP Program Statement. Program Statement 5500.09, cited by the Warden, is unrelated to strip searches and is unavailable to inmates. Program Statement 5521.05 governs searches of inmates.

Not knowing of the Warden's mistake, Nunez attempted to obtain Program Statement 5500.09, to which he had been referred by the Warden. On June 11, four days after the Warden's response, Nunez filed a BP-8 requesting a copy of Program Statement 5500.09. He wrote:

> I received the response of my BP-9. However I went to the law library and I do not find Program Sta-[te]ment 5500.09, Chapter 6, page 5, paragraph D. Would you please supply me with a copy for me to read.

FPC administrator Mike Sandels denied this request on June 13, writing that Program Statement 5500.09 was "restricted" and not available to inmates. Sandels did not indicate to Nunez that the Warden had cited the wrong Program Statement.

On June 25, Nunez filed another BP-8 requesting a copy of Program Statement 5500.09. On August 13, Nunez filed yet another BP-8, this time requesting a response to his June 25 BP-8. Correctional Counselor Angus responded on August 15, writing that Nunez would need to file a Freedom of Information Act ("FOIA") request to obtain Program Statement 5500.09. Angus did not indicate in his response that the Program Statement was unavailable to inmates. Nor did Angus provide the number of the Program Statement relevant to strip searches.

Five days later, on August 20, Nunez made a request for Program Statement 5500.09 to the FOIA office of the BOP, as Angus had suggested. On September 4, the FOIA office denied Nunez's request, stating that this Program Statement "relates to internal security practices of the agency" and that its release "could risk circumvention of agency regulations." On October 14, Nunez wrote a letter to the Department of Justice's Office of Information and Privacy ("OIP") appealing the BOP's denial of his FOIA request. On November 13, OIP

notified Nunez that it had a "substantial backlog of pending appeals received prior to" his letter. After not hearing anything further from OIP, Nunez sent another letter to OIP on January 26, 2003. After receiving no reply, he sent yet another letter to OIP on February 13. After receiving no reply to either his January 26 or February 13 letter, he sent a final letter to OIP on April 8, stating "I consider my appeal as denied."

On March 27, just before he sent his letter to the OIP stating that he considered his FOIA appeal denied, Nunez filed a BP-10 with the Regional Director. He wrote:

> After the Bureau of Prisons grant inmate Nunez BP-9's, inmate Nunez has exhausting his administrative remedies regarding the copy of the PS 5500.09 Chapter 6, Page 5, Paragraph D. (SEE ATTACHED). Before Nunez file his [B]ivens act.

The Regional Director rejected Nunez's BP-10 the next day on the ground that it was untimely. He wrote that a BP-10 appealing a Warden's adverse decision on a BP-9 must be received within 20 days of the Warden's decision. As recounted above, the Warden's response to Nunez's BP-9 (in which he had cited the wrong Program Statement) had been signed on June 7, 2002.

On April 22, 2003, Nunez filed a BP-11 appealing the Regional Director's denial of his March 27 BP-10 to the Central Office. The Central Office denied Nunez's BP-11 on April 30, on the ground that his BP-10 had been untimely. The Central Office wrote that Nunez had had 20 days from June 10, 2002, to submit his BP-10, and that he had not done so within that time period. (The Central Office erred in citing June 10 rather than June 7.)

Finally, on August 19, 2003, OIP sent Nunez a letter denying his FOIA request for Program Statement 5500.09. OIP

attached Program Statement 5521.05 to its letter. This was the Program Statement that the Warden should have cited, but did not, in his June 7, 2002 response to Nunez's BP-9 filed on May 23, 2002. This was the first time Nunez was informed that Program Statement 5500.09 had nothing to do with strip searches.

### b.    First Amendment Claim

On June 6, Nunez was transferred from his orderly job at the FCI to a job on the FPC food service crew. Nunez filed a BP-8 on the same day, alleging that he was fired from his FCI orderly job because he had filed complaints about the strip search. Nunez requested that he be assigned to his previous job in the recreation department or to an FPC administration or orderly crew. He stated that to "[b]e placed in the kitchen would be considered a punishment." Nunez never received a response to this BP-8, and he did not pursue the claim further.

On June 10, Nunez filed a "sensitive" BP-9 with the Regional Director. Nunez wrote on the form:

> On May 30 at 7:20 AM Nunez was called by lieutenant Johnson who requested clarification over the legal language used in Nunez BP-9 form. At that time, Nunez was verbally notified that the BP-9 was denied, and that Nunez was fired from my orderly job. Later, the same day, at 7:35 AM, Nunez was called again by Captain M. Smith who contradicted lieutenant's assertion over the denial of Nunez BP-9. The Captain stated, that if Nunez wanted the BP-9 answered, that Nunez better be clean.

Nunez stated that Smith's statements on May 30 were meant to intimidate him and indicated "potential retaliation." He also stated that he was fired from his orderly job as retaliation for not withdrawing his earlier BP-9. The Regional Director

rejected the "sensitive" BP-9 the next day, stating that it was not in fact sensitive and that Nunez "should file a request or appeal at the appropriate level via regular procedures." Nunez did not appeal the Regional Director's adverse decision.

## C.   Nunez's Suit in District Court

On October 3, 2003, Nunez filed a pro se action in federal district court under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). He alleged that prison officials (collectively, "defendants") had subjected him to an unlawful strip search in violation of the Fourth Amendment, had obstructed his efforts to complain of the search in violation of his right to due process, and had retaliated against him for his complaints. Nunez characterized the defendants' alleged retaliation as a violation of the Eighth Amendment.

The district court granted summary judgment in favor of defendants. It first held that Nunez failed to exhaust his administrative remedies as required by the PLRA. In the alternative, it held that defendants were entitled to summary judgment on the merits.

Nunez timely appealed.

## II.   Standard of Review

We review *de novo* the district court's interpretation of the PLRA's exhaustion requirement and the court's determination that a prisoner failed to exhaust administrative remedies. *See Vaden v. Summerhill*, 449 F.3d 1047, 1049 (9th Cir. 2006).

We review *de novo* the district court's grant of summary judgment. *Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004); *see also Moore v. Glickman*, 113 F.3d 988, 989 (9th Cir. 1997) (reviewing a district court's grant of summary judgment in a *Bivens* civil rights action de novo). We "view the evidence . . . in the light most favorable to the non-moving

party and draw all reasonable inferences in favor of that party." *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008). We then determine "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc).

## III.   Discussion

### A.   Fourth Amendment Claim

For the reasons that follow, we hold with respect to Nunez's Fourth Amendment claim that his failure to exhaust his administrative remedies is excused. However, we hold that the district court correctly granted summary judgment against Nunez on the merits of the claim.

#### 1.   Exhaustion of Administrative Remedies

##### a.   Background

[1] The PLRA provides that no suit may be brought under federal law concerning prison conditions until available administrative remedies have been exhausted:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any . . . correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

[2] In *Woodford v. Ngo*, 548 U.S. 81, 93 (2006), the Supreme Court held that the PLRA requires "proper" exhaustion of administrative remedies. It wrote, "Proper exhaustion demands compliance with an agency's deadlines and other

critical procedural rules." *Id.* at 90. This is so "because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91.

The Court held that the exhaustion requirement of the PLRA is based on administrative law rather than federal habeas corpus. *Id.* at 93. It wrote that exhaustion of administrative remedies serves two important purposes. First, exhaustion "gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,' and it discourages 'disregard of [the agency's] procedures.' " *Id.* at 89 (citation omitted) (bracketed material in original). "Second, exhaustion promotes efficiency" because "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.*

Justice Breyer concurred in the judgment. He wrote, "I agree with the Court that . . . Congress intended the term 'exhausted' to 'mean what the term means in administrative law, where exhaustion means proper exhaustion.' . . . Administrative law, however, contains well-established exceptions to exhaustion." *Id.* at 103 (Breyer, J., concurring). "At least two Circuits that have interpreted the statute in a manner similar to that which the Court today adopts have concluded that the PLRA's proper exhaustion requirement is not absolute. In my view, on remand, the lower court should similarly consider any challenges that respondent may have concerning whether his case falls into a traditional exception that the statute implicitly incorporates." *Id.* at 104 (citations omitted).

In *Jones v. Bock*, 549 U.S. 199 (2007), decided a year after *Ngo*, the Court refused to read the PLRA's exhaustion requirement in a draconian manner. The Court rejected three strict versions of exhaustion that some lower federal courts had read into the PLRA. First, the Court held that the PLRA does not require that a prisoner's federal court complaint

affirmatively plead exhaustion; rather, lack of exhaustion must be asserted as a defense. *Id.* at 211-17. Second, the Court held that the PLRA does not require that a prisoner identify in his initial prison grievance each of the defendants later sued in federal court; rather, to the extent that any such requirement may exist, it must come from prison regulations prescribing the grievance process for that prison. *Id.* at 217-19. Third, the Court held that the PLRA does not require that a prisoner include only exhausted claims in his federal court complaint, on pain of having his entire complaint dismissed if he includes an unexhausted claim; rather, if a prisoner includes both exhausted and unexhausted claims, the court should dismiss only the unexhausted claim or claims. *Id.* at 219-24.

On remand from the Supreme Court in *Ngo*, a year after the Court's decision in *Jones v. Bock*, we noted that the Court had left "unclear whether we can read exceptions into the PLRA's exhaustion requirement." *Ngo v. Woodford*, 539 F.3d 1108, 1110 (9th Cir. 2008). We noted several potentially applicable exceptions but concluded that we did not need to decide whether they were available because Ngo could not satisfy them in any event: "Ngo hasn't shown that administrative procedures were unavailable, that prison officials obstructed his attempt to exhaust or that he was prevented from exhausting because procedures for processing grievances weren't followed." *Id.*

Several of our sister circuits have allowed exceptions to the PLRA's exhaustion requirement in the wake of the Court's decision in *Ngo*. For example, in *Kaba v. Stepp*, 458 F.3d 678, 684-86 (7th Cir. 2006), the Seventh Circuit remanded to the district court to determine whether prison officials' threats had effectively prevented the prisoner from exhausting his administrative remedies. The court wrote approvingly of a decision in which the Third Circuit had "held that administrative remedies were unavailable where the prison officials erroneously told the prisoner that he must wait until the inves-

tigation was complete before filing a grievance." *Id.* at 684 (citing *Brown v. Croak*, 312 F.3d 109, 111-12 (3d Cir. 2002)). In *Turner v. Burnside*, 541 F.3d 1077, 1085 (11th Cir. 2008), the Eleventh Circuit held that a prisoner who had been threatened with retaliation by prison officials if he filed a grievance was excused from complying with the PLRA's exhaustion requirements. The court wrote: "[T]o be 'available' a remedy must be 'capable of use for the accomplishment of [its] purpose.' Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes and so are not available." *Id.* at 1084 (citation omitted). In *Macias v. Zenk*, 495 F.3d 37, 45 (2d Cir. 2007), the Second Circuit remanded for a determination whether a prison official's threats had deterred the prisoner from exhausting his administrative remedies, rendering those remedies effectively unavailable, and whether the defendants should therefore be estopped from asserting lack of exhaustion as a defense.

### b. Application to Nunez

We hold that Nunez's failure to timely exhaust his administrative remedies is excused because he took reasonable and appropriate steps to exhaust his Fourth Amendment claim and was precluded from exhausting, not through his own fault but by the Warden's mistake.

**[3]** Nunez took various steps to exhaust his administrative remedies with respect to his Fourth Amendment claim. He filed both his BP-8 informal complaint, and then his formal BP-9 with the Warden, within 20 days of the incident, as required by 28 C.F.R. § 542.14(a). Nunez clearly stated his Fourth Amendment claim in his BP-8, writing that, "The interest in human dignity and privacy which the Fourth Amendment protects forbid any searches involving intrusions beyond the body's surface on the mere chance of a lottery amusement."

**[4]** The BP-8 put prison officials on notice of Nunez's Fourth Amendment claim. The response rejecting his BP-8 is

signed by both a Correctional Counselor and a Unit Manager. Nunez again put the Warden on notice of his Fourth Amendment claim in his BP-9, questioning how the strip search could be justified by a statute or regulation "without violating the constitutional limits." Nunez's grievance sufficed to state his Fourth Amendment claim by " 'alert[ing] the prison to the nature of the wrong for which redress [was] sought.' " *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)).

**[5]** The Warden dealt with Nunez's BP-9 by citing Chapter 6, page 5, paragraph D, of Program Statement 5500.09. Nunez thought, as would any reasonable prisoner in his situation, that he needed to read Program Statement 5500.09—indeed, a very specific portion of Program Statement 5500.09—in order to pursue his grievance. Contrary to the contention of our dissenting colleague, we do not hold that exhaustion is excused because "Nunez could not obtain information that he subjectively believed would be useful in preparing his appeal." Dissent at 779. Instead, we hold that exhaustion is excused because Nunez could not reasonably be expected to exhaust his administrative remedies without the Program Statement that the Warden claimed to mandate the strip search, and because Nunez timely took reasonable and appropriate steps to obtain it.

Immediately, upon receiving the Warden's response, Nunez set out to obtain a copy of Program Statement 5500.09. When Nunez could not find it in the prison library, he filed three successive BP-8s attempting to obtain it. Correctional Officer Angus responded to his third BP-8 by telling him that he needed to file a FOIA request. Nunez then filed a request with the FOIA office of the BOP, which was denied. He appealed that decision to OIP in the Justice Department in October 2002. OIP replied in November, saying that it had a substantial backlog. Nunez then wrote letters to OIP in January and February 2003, to which he received no response. Finally, in

early April, Nunez wrote to OIP stating that he construed its silence as a denial.

On March 27, just before he sent his final letter to OIP, Nunez filed a BP-10 with the Regional Director, appealing the Warden's denial of his BP-9. In his BP-10, Nunez stated that he had "exhaust[ed] his administrative remedies regarding the copy of the PS 550[0].09, Chapter 6, Page 5, Paragraph D." The clear import of this statement is that Nunez had thought that he needed to obtain the Program Statement to which the Warden had referred him before pursuing his appeal of the Warden's decision. When Nunez inferred that OIP, by its silence, had denied his FOIA request, he concluded that he had exhausted his administrative remedies with respect to seeking the Program Statement. He then filed his BP-10 with the Regional Director.

Nunez believed in good faith that Program Statement 5500.09 was necessary, not merely useful, for preparing his appeal. He could hardly believe otherwise once the Warden told him that the challenged strip search was authorized by that Program Statement. After Nunez despaired of getting Program Statement 5500.09 and filed his BP-10 with the Regional Director, he was finally told by the FOIA office that the Program Statement 5500.09 did not relate to strip searches. But up until that time, Nunez reasonably believed, based on the Warden's written response to his BP-9, that he needed to see Program Statement 5500.09 before he could prepare an effective appeal.

[6] There is nothing in the record to suggest bad faith or deliberate obstruction by the Warden or other prison officials. So far as the record shows, the Warden's erroneous citation of Program Statement 5500.09 was an innocent mistake. But innocent or otherwise, the mistake led Nunez on an almost ten-month wild goose chase. When Nunez finally concluded that his FOIA request to OIP had been denied, having done everything he could do to obtain a document that the Warden

had led him to believe he needed, he promptly filed his BP-10. Rational inmates cannot be expected to use grievance procedures to achieve the procedures' purpose when they are misled into believing they must respond to a particular document in order to effectively pursue their administrative remedies and that document is then not available. *See Brown v. Croak*, 312 F.3d at 111-12 (administrative remedies unavailable where prison officials erroneously told prisoner he must wait until investigation was complete); *Turner*, 541 F.3d at 1084.

**[7]** Just as the PLRA's exhaustion requirement gives prisoners the proper incentive to pursue their complaints efficiently, excusing that requirement under the circumstances of this case gives prison officials the same incentive to address prisoners' complaints. Allowing an excuse for failure to exhaust under the circumstances of this case furthers the PLRA's goal of efficiency by " 'reduc[ing] the quantity and improv[ing] the quality of prisoner suits.' " *Ngo*, 548 U.S. at 94 (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). As the Supreme Court explained in *Ngo*, the PLRA's exhaustion requirement advances this goal by: (1) "giv[ing] prisoners an effective incentive to make full use of the prison grievance process;" (2) reducing prisoner suits as some prisoners are "persuaded by the proceedings not to file an action in federal court;" and (3) improving the quality of any remaining prisoner suits "because proper exhaustion often results in the creation of an administrative record that is helpful to the court." *Ngo*, 548 U.S. at 94-95. The Warden's mistake and the BOP's subsequent failure to correct that mistake undermined all three benefits of the proper exhaustion requirement. Nunez made every effort to make full use of the prison grievance process, but was stymied by the error. Had Nunez or someone in his position been provided with the correct program statement upon his initial request, he may have been satisfied and dropped his complaint, thus reducing the quantity of suits. Alternatively, armed with the correct program statement, Nunez or someone in his position may have still believed that

his Fourth Amendment rights were violated, but the quality of his suit would have been enhanced.

**[8]** We therefore hold, under the circumstances of this case, that the Warden's mistake rendered Nunez's administrative remedies effectively unavailable, and that his failure to exhaust them is excused.

## 2. Merits

Nunez contends that a material question of fact exists regarding whether his Fourth Amendment rights were violated by the strip search. We disagree and affirm the district court's grant of summary judgment to defendants.

**[9]** *Turner v. Safley*, 482 U.S. 78 (1987), provides the standard for reviewing alleged infringements of prisoners' constitutional rights. *See Washington v. Harper*, 494 U.S. 210, 224 (1990) (stating that *Turner* applies whenever "the needs of prison administration implicate constitutional rights"); *Michenfelder v. Sumner*, 860 F.2d 328, 331 (9th Cir. 1988) (applying the *Turner* standard to prisoners' allegations of Fourth Amendment violations). *Turner* provides that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

**[10]** Searches of prisoners must be reasonable to be constitutional. *See Michenfelder*, 860 F.2d at 332. The reasonableness of a particular search of a prisoner is determined by applying the balancing test the Supreme Court announced in *Bell v. Wolfish*, 441 U.S. 520 (1979). *See Michenfelder*, 860 F.2d at 332. In *Bell*, the Court wrote:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the inva-

sion of personal rights that the search entails. Courts must consider the *scope* of the particular intrusion, the *manner* in which it is conducted, the *justification* for initiating it, and the *place* in which it is conducted.

441 U.S. at 559 (emphasis added).

**[11]** The BOP has a policy authorizing periodic strip searches of inmates returning from outside work details. This policy is stated in 28 C.F.R. § 552.11 and BOP Program Statement 5521.05. Section 552.11(c)(1) allows prison staff to

conduct a visual search where there is reasonable belief that contraband may be concealed on the person, or a good opportunity for concealment has occurred. For example, placement in a special housing unit (see 28 CFR part 541, subpart B), leaving the institution, or re-entry into an institution after contact with the public (after a community trip, court transfer, or after a "contact" visit in a visiting room) is sufficient to justify a visual search. The visual search shall be made in a manner designed to assure as much privacy to the inmate as practicable.

A "visual search" is defined as "a visual inspection of all body surfaces and body cavities." 28 C.F.R. § 552.11(c). Program Statement 5521.05, which includes "implementing information" on 28 C.F.R. § 552.11(c), states that prison officials are required to "conduct[ ] periodic visual searches of inmates returning from outside work details."

**[12]** Nunez does not contend that the BOP policy is unreasonable, and that it therefore violates the Fourth Amendment. Instead, Nunez contends that the particular strip search to which he was subjected was unreasonable. He contends that a material question of fact exists regarding whether there was sufficient justification for the search, and therefore whether it

was "excessive, vindictive, harassing, and unrelated to any legitimate penological interest." *See Michenfelder*, 860 F.2d at 332. In particular, he contends further that the "raffle" Duncan used to select Nunez for the strip search was the exercise of "standardless and unconstrained discretion." We disagree.

First, the prison regulation allowing for visual searches, 28 C.F.R. § 552.11 as implemented by Program Statement 5521.05, is valid under *Turner* as it is "reasonably related to legitimate penological interests." Controlling contraband within a prison is a legitimate penological interest, *see Bell*, 441 U.S. at 550-51, and the policy is reasonably related to this interest.

**[13]** Second, whether Duncan targeted Nunez for the search for non-penological reasons is irrelevant under the Fourth Amendment. In *Whren v. United States*, 517 U.S. 806, 813 (1996), the Supreme Court held that, in evaluating the reasonableness of a traffic stop, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." The Court subsequently expanded the holding of *Whren* to other Fourth Amendment cases, clarifying that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' " *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). The evidence Nunez presented that Duncan was motivated to search him for non-penological reasons is therefore irrelevant to the reasonableness of the search.

## B.   First Amendment Claim

**[14]** We hold that Nunez failed to properly exhaust his other claims, which have collectively been labeled a single First Amendment claim for the first time on appeal. We assume without deciding that Nunez properly asserted a First Amendment claim in his complaint in the district court.

**[15]** Nunez first mentioned retaliation and intimidation in the sensitive BP-9, which he filed with the Regional Director on June 10, 2002. Nunez followed the proper procedure for a complaint he deemed sensitive. 28 C.F.R. § 542.14(d)(1) provides:

> If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution.

The Regional Director responded one day later, stating that the complaint was not sensitive, directing him to "file a request or appeal at the appropriate level via regular procedures." *See* 28 C.F.R. § 542.14(d)(1) (If the Regional Director does not agree that the request is sensitive, "the inmate shall be advised in writing of that determination . . . . The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden."). Nunez did not pursue the matter further, either by appealing the Regional Director's decision that his retaliation claim was not sensitive or by filing a request with the Warden.

Nunez had filed a BP-8 on June 6, 2002, protesting his transfer from the orderly work crew to the food service crew and requesting a different work assignment. However, this BP-8 was filed before he received a response from the Regional Director deeming his BP-9 not sensitive. Therefore, it could not have been a response to the Regional Director's instruction that he file a request under the normal procedures. Even if it was, Nunez pursued no other administrative remedies when he received no response to his BP-8.

Conclusion

**[16]** We hold that Nunez's failure to exhaust his Fourth Amendment claim through the BOP grievance process is excused. However, we affirm the district court's grant of summary judgment to defendants on Nunez's Fourth Amendment claim on the merits. We affirm the district court's grant of summary judgment to defendants on Nunez's First Amendment claim for failure to exhaust his administrative remedies.

**AFFIRMED**.

IKUTA, Circuit Judge, dissenting in part:

The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), commands that, "No action shall be brought with respect to prison conditions under . . . Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Today, the majority creates a new exception to this exhaustion requirement, one that will free prisoners from exhausting available remedies merely because the prison failed to provide information requested by the prisoners to support their claims. Because this new exception is untethered to the statutory language of the PLRA and lacks any basis in case law, I respectfully dissent from the majority's reasoning in part III.A.1.[1]

Though neither the PLRA nor our case law has explicitly defined the term "available," we have indicated that an administrative remedy is available if a prisoner has "the opportunity and ability" to file a grievance on a timely basis. *See Marella v. Terhune*, 568 F.3d 1024, 1028 (9th Cir. 2009)

---

[1]I agree that Nunez failed to exhaust his First Amendment claim, and so I join the majority's opinion as to part III.B.

(per curiam). Because the prisoner must "complete the administrative review process in accordance with the applicable procedural rules," *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006), the exhaustion requirement is not satisfied when grievances are dismissed because prisoners missed deadlines or otherwise failed to comply with the grievance policy. *See Jones v. Bock*, 549 U.S. 199, 217-18 (2007); *see also Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) ("[A] prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are.")*; Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006) ("[W]hen the prisoner causes the unavailability of the grievance process by simply not filing a grievance in a timely manner, the process is not unavailable but rather forfeited.")

Where prison officials have effectively prevented a prisoner from using the available procedures, for example by literally denying the prisoner access to the process, falsely claiming that the prisoner could not use the process, or threatening reprisals if the prisoner used the process, courts have held that administrative remedies were not "available" for purposes of the PLRA. *See, e.g.*, *Turner v. Burnside*, 541 F.3d 1077, 1081, 1085 (11th Cir. 2008) (holding that administrative remedies were unavailable where the warden tore up the prisoner's initial grievance in front of the prisoner and threatened to transfer the prisoner away from his family if the prisoner continued to file such grievances); *Kaba*, 458 F.3d at 686 (holding that administrative remedies were not available where the prison official warned the prisoner not to file a grievance and successfully pressured other inmates to assault the prisoner in order to prevent the prisoner from pursuing the grievance); *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir. 2002) (holding that a complaint was sufficient to survive a motion to dismiss for failure to exhaust where prisoner alleged that prison officials told him he could not file a formal grievance until the completion of an investigation, but failed to tell him when that event occurred); *Miller v. Norris*, 247

F.3d 736, 738, 740 (8th Cir. 2001) (holding that the prisoner's allegation and evidence that prison officials refused to mail the prisoner the required administrative forms was sufficient to raise an inference that he had exhausted available remedies)*; cf. Panaro v. City of N. Las Vegas*, 432 F.3d 949, 952-53 (9th Cir. 2005) (holding that pretrial detainee must allege that the detention center's grievance process was "systematically unavailable to him").

Here, the prison's clerical error created no such barrier to Nunez's ability to use administrative procedures. Nunez's original BP-8 raised his complaint that Duncan's use of a raffle to determine who would be subject to a strip search violated Nunez's Fourth Amendment rights. *See* Maj. Op. at 758. Angus's response to Nunez's BP-8 directly addressed Nunez's Fourth Amendment concerns by explaining that Duncan's lottery system was a fair method to conduct random searches. *See* Maj. Op. at 758. Nunez did not carry this claim to the next stage of administrative review, but instead sought from prison officials a copy of the program statement that authorized the search. *See* Maj. Op. at 758-62. The prison officials inadvertently miscited the program statement Nunez requested, *see* Maj. Op. at 759, but did not deny Nunez access to the grievance process. The majority recognizes this point when it states "[w]hen Nunez could not find [Program Statement 5500.09] in the prison library, he filed three successive BP-8s attempting to obtain it." Maj. Op. at 768. Nor is there any evidence in the record that prison officials told Nunez that he could not administratively pursue his Fourth Amendment claim without a copy of the program statement. Instead, the record shows that the prison officials accurately informed Nunez of the substance of the applicable program statement in response to Nunez's initial BP-9, and also informed Nunez that if he was "dissatisfied with this response, [he] may appeal to the Regional Director." Maj. Op. at 759. Not only did Nunez have the "opportunity and ability," *Marella*, 568 F.3d at 1028, to use the prison's grievance procedure, he actually

used the process after the event that ostensibly rendered his remedies "unavailable."

The majority attempts to skirt the significance of Nunez's vigorous use of the prison's administrative procedures by claiming that Nunez "believed in good faith that Program Statement 5500.09 was necessary, not merely useful, for preparing his appeal," Maj. Op. at 769, although there is no support in the record for this speculation about Nunez's subjective belief. The majority infers that Nunez must have believed the program statement was necessary because "the Warden told him that the challenged strip search was authorized by that Program Statement." Maj. Op. at 769. But it does not follow from the Warden's statement that Nunez needed a copy of the program statement for his appeal. Nunez, for one, clearly concluded that the program statement was not necessary to his appeal given that his Fourth Amendment claim in his district court complaint does not even mention, let alone rely on, the program statement.

Accordingly, the prison officials' conceded miscitation of the program statement did not make the administrative grievance process "unavailable" to Nunez under any fair reading of that term. Like any missed deadline or procedural default, Nunez's failure to comply with the regulations, where he faced no obstruction to doing so, is nothing more than a forfeiture of the prison's grievance procedure. *See Jones*, 549 U.S. at 218; *Moore*, 517 F.3d at 725. Under these circumstances, our case law is clear: Because Nunez had the "opportunity and ability" to file his grievance in a timely manner, but failed to do so, his case should be dismissed. *Marella*, 568 F.3d at 1028.

By holding that Nunez is excused from the PLRA's exhaustion requirement, despite the availability of administrative remedies, the majority's opinion creates a new exception to the PLRA that is untethered from the language of § 1997e(a). According to the majority, exhaustion is excused

so long as a prisoner (1) takes "reasonable and appropriate steps" to exhaust a claim, and (2) "was precluded from exhausting, not through his own fault but by the Warden's mistake." Maj. Op. at 767. Given the record in this case, the majority apparently understands "precluded" to mean that Nunez could not obtain information that he subjectively believed would be useful in preparing his appeal. Therefore, the majority's lenient new rule eliminates the PLRA's exhaustion requirement when a prison's clerical error delays the prisoner in obtaining helpful information.[2]

The majority's new exception is far afield from the language of the PLRA and is unsupported by case law. We are "bound by the literal command of the PLRA, which precludes an action by a prisoner 'until such available administrative remedies as are available have been exhausted,' " *Panaro*, 432 F.3d at 953 (quoting § 1997e(a)), and there is no statutory basis for the majority's conclusion that if the prison officials are insufficiently helpful in the prisoner's efforts to litigate a grievance, the PLRA's exhaustion requirement is excused. The Supreme Court has been clear that administrative procedures must be properly exhausted, even where it may appear futile. *See Booth*, 532 U.S. at 741. By the same token, Nunez should not be excused from exhausting his administrative remedies even if he thought his claim would be less effective without a copy of the prison's written policy. Contrary to the

---

[2]In discussing the PLRA's exhaustion requirement, the majority cites Justice Breyer's concurrence in *Ngo* for his view that the PLRA exhaustion requirement incorporated "well-established exceptions to exhaustion" contained in administrative law. Maj. Op. at 765 (citing and quoting *Ngo*, 548 U.S. at 103-04 (Breyer, J., concurring)). However, the Supreme Court has not adopted this analysis. Indeed, a unanimous Supreme Court previously rejected this very idea, stating that "we will not read futility or other exceptions into [the PLRA's] statutory exhaustion requirements where Congress has provided otherwise." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001); *see Ngo v. Woodford*, 539 F.3d 1108, 1110 (9th Cir. 2008) (recognizing the tension between *Booth* and Justice Breyer's *Ngo* concurrence*).*

majority's analysis, *see* Maj. Op. at 767-68, the question whether Nunez was reasonable in pursuing the program statement before exhausting administrative remedies is irrelevant under the PLRA.

The majority's effort to support its new exception by relying on policy considerations is also unpersuasive. The majority claims that its new rule serves the PLRA's dual goals of "reduc[ing] the quantity and improv[ing] the quality of prisoner suits," *Ngo*, 548 U.S. at 94 (quotation marks omitted), because:

> Had Nunez or someone in his position been provided with the correct program statement upon his initial request, he may have been satisfied and dropped his complaint, thus reducing the quantity of suits. Alternatively, armed with the correct program statement, Nunez or someone in his position may have still believed that his Fourth Amendment rights were violated, but the quality of his suit would have been enhanced.

Maj. Op. at 770. Yet the facts of this case directly contradict these suppositions. We know that Nunez would not have been satisfied upon receiving the program statement because he pursued his claim even after he received it. Likewise, we know exactly how the program statement enhanced the quality of Nunez's suit, which is to say not at all, because when Nunez actually filed his complaint he did not use the program statement in making his Fourth Amendment claim. The majority conjectures that a person "in [Nunez's] position" might have dropped his claim or improved his claim had the prison provided the program statement, but fails to explain why such a person would have behaved differently than Nunez did. Rather than supporting the goals of the PLRA, the majority's new exception to the PLRA's exhaustion requirement will defeat those goals by increasing the number of suits, reducing the quality of the administrative record, and

preventing prisons from addressing complaints at the administrative stage. *Cf. Jones*, 549 U.S. at 219 (listing the benefits of exhaustion). Moreover, policy considerations cannot detract from our obligation to apply the language of the statute. As the Supreme Court warned us in this very context: "Whatever temptations the statesmanship of policy-making might wisely suggest, the judge's job is to construe the statute —not make it better." *Jones*, 549 U.S. at 216 (quotation marks omitted).

Because there is no basis to hold that administrative remedies for Nunez's Fourth Amendment challenge were unavailable, and because we have no authority to create a new exception to the PLRA, we should affirm the district court's dismissal of Nunez's claim.[3] The majority's new exhaustion exception will open the door to "excuses" that prisoners need not comply with the exhaustion requirement based solely on prison officials' clerical errors. I respectfully dissent.

---

[3]Accordingly, I would not reach the merits of Nunez's Fourth Amendment claim, as the majority does in part III.A.2.