In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 16-4234

DELORES HENRY, *et al.*, on behalf of a class,

*Plaintiffs-Appellants*,

*v.*

MELODY HULETT, former Warden of Lincoln Correctional Center, *et al.*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court
for the Central District of Illinois.
No. 12-CV-3087 — **Richard Mills**, *Judge*.

———————————

ARGUED NOVEMBER 30, 2017 — DECIDED JULY 16, 2019

———————————

Before EASTERBROOK and MANION, *Circuit Judges*, and JOHN Z. LEE, *District Judge*.[*]

EASTERBROOK, *Circuit Judge*. Members of a certified class contend that during 2011 female inmates at an Illinois prison were strip-searched as part of a training exercise for cadet

———————————

[*] Of the Northern District of Illinois, sitting by designation.

guards. The district court summarized the allegations this way:

> [Plaintiffs] were required to stand naked, nearly shoulder to shoulder with 8-10 other inmates in a room where they could be seen by others not conducting the searches, including male officers. Menstruating inmates had to remove their tampons and sanitary pads in front of others, were not given replacements, and many got blood on their bodies and clothing and blood on the floor. The naked inmates had to stand barefoot on a floor dirty with menstrual blood and raise their breasts, lift their hair, turn around, bend over, spread their buttocks and vaginas, and cough.

2016 U.S. Dist. LEXIS 194393 at *6 (C.D. Ill. Apr. 14, 2016). Plaintiffs maintained that such an inspection—unnecessary for security and conducted in an offensive manner—violated their rights under both the Fourth Amendment and the Eighth Amendment, applied to the states by the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. §1983.

The district court awarded summary judgment to defendants on the Fourth Amendment theory, because *Johnson v. Phelan*, 69 F.3d 144 (7th Cir. 1995), and *King v. McCarty*, 781 F.3d 889 (7th Cir. 2015), hold that a visual inspection of a convicted prisoner is not subject to analysis under that amendment, though a claim properly lies under the Eighth Amendment if an unnecessary or demeaning inspection amounts to punishment. The Eighth Amendment claim went to trial, and a jury returned a verdict for the defendants. Plaintiffs do not contest the verdict but ask us to reinstate their Fourth Amendment theory. Because analysis under the Fourth Amendment is objective, see *Graham v. Connor*, 490 U.S. 386 (1989), while a successful claim under the Eighth Amendment depends on proof of a culpable mental state, see *Whitley v. Albers*, 475 U.S.

312 (1986), plaintiffs believe that they could succeed on a Fourth Amendment theory despite the jury's verdict.

The Fourth Amendment applies only to the extent that prisoners retain a legitimate expectation of privacy. *Johnson* and *King* rely on *Hudson v. Palmer*, 468 U.S. 517, 524–30 (1984), which holds that prisoners lack privacy interests in their cells and implies that they lack any legitimate expectation of privacy inside prison walls. The judgments of conviction allow wardens to control and monitor their charges' lives, extinguishing the rights of secrecy and seclusion that free people possess. But *Hudson* did not consider whether convicted prisoners have some residual privacy interest in their persons, as opposed to their possessions and surroundings. The Justices have not returned to that subject in later decisions. Decisions in this circuit look in both directions on that topic. Compare *King* with, e.g., *Peckham v. Wisconsin Department of Corrections*, 141 F.3d 694 (7th Cir. 1998).

*King* reconciles the circuit's competing strands of thought this way: the Fourth Amendment does not apply to visual inspections of convicted prisoners but does apply to procedures that entail intrusions within prisoners' bodies. 781 F.3d at 899–901. That approach is justified not only by the holding of *Hudson* but also by the need to maintain the subjective component of Eighth Amendment analysis. In decisions such as *Whitley* the Justices stressed that guards will take many steps that offend and even injure prisoners, yet contribute to prison management and security. Only those steps that are unnecessary and intended to produce injury, the Court explained, should be actionable.

An appropriate balance of prisoners' interests against the needs of prison management is achieved through normal

Eighth Amendment analysis, which has both objective and subjective elements. See also, e.g., *Helling v. McKinney*, 509 U.S. 25 (1993); *Farmer v. Brennan*, 511 U.S. 825 (1994). Applying the Fourth Amendment to all unwelcome observations of prisoners would eliminate the subjective component and create a sort of Eighth Amendment lite, defeating the objectives that the Justices sought to achieve by limiting liability in *Whitley* and similar decisions. See *King*, 781 F.3d at 900–01.

Even when the Fourth Amendment or the Due Process Clause applies, as one or the other will before conviction, strip searches often are reasonable and thus permissible. See *Florence v. Board of Freeholders*, 566 U.S. 318 (2012); *Bell v. Wolfish*, 441 U.S. 520, 558–60 (1979). But the absence of a subjective component in determining what is reasonable under the Fourth Amendment would produce outcomes that depart from the approach required by *Whitley* for prisoners after conviction. It would effectively equate the rights of convicted prisoners with those of arrestees or pretrial detainees. Many decisions hold that convicts' rights are more limited.

*King* obliged the district judge to resolve this case as he did. Plaintiffs allege a visual inspection, not a physical intrusion. They maintain that each inmate had to manipulate her own body but do not contend that the prison's staff touched any inmate. A prisoner's need to touch her own body does not differentiate this situation from that of *Florence*, which concluded that a visual inspection (visual on the guards' part) is reasonable even with respect to pretrial detainees.

Plaintiffs ask us to overrule *Johnson* and *King* to the extent that they deem the Fourth Amendment inapplicable to visual inspections of convicted prisoners. We decline.

The law in some other circuits is favorable to plaintiffs. See, e.g., *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016); *Hutchins v. McDaniels*, 512 F.3d 193, 196 (5th Cir. 2007). The law in this circuit does not favor plaintiffs, however, and decisions such as *Hudson* are at best neutral. If the flat declaration in *Hudson* that a prisoner lacks any legitimate expectation of privacy in a cell, 468 U.S. at 526, applies only while the prisoner is *in* a cell, that still falls short of establishing that the Fourth Amendment applies elsewhere in a prison. And we know from *Samson v. California*, 547 U.S. 843 (2006), that even after conditional release a convicted person has a severely diminished expectation of privacy until the end of the sentence. *Samson* allowed a parolee to be searched without either probable cause or suspicion, and it stressed the extent to which a conviction curtails privacy.

The most one can say for plaintiffs is that judges, including those within the Seventh Circuit, have disagreed about whether the Fourth Amendment ever prevents guards from viewing naked prisoners. *Johnson* was decided over a dissent. A concurring opinion in *King* expressed doubt about the majority's analysis, as a concurring opinion in *Peckham* expressed doubt about the analysis of the majority there.

It has been 35 years since the Justices last considered the extent to which convicted prisoners have rights under the Fourth Amendment while still inside prison walls. For more than 20 years it has been established in this circuit that the Fourth Amendment does not apply to visual inspections of prisoners. It is best to leave the law of the circuit alone, unless and until the Justices suggest that it needs change.

AFFIRMED

LEE, *District Judge*, dissenting. In prior decisions, we have recognized that convicted prisoners have a reasonable expectation of privacy in the interior of their bodies sufficient to trigger the Fourth Amendment's safeguard against unreasonable searches (although, as we shall see, this line differentiating a prisoner's bodily interior versus exterior is not mandated by Supreme Court precedent, recognized by any of our sister circuits, or even uniformly applied by this Court, *see King v. McCarty*, 781 F.3d 889, 902–04 (7th Cir. 2015) (Hamilton, J., concurring in part and concurring in judgment)). To this rule, the majority now appends an additional hurdle—a prisoner can invoke the Fourth Amendment only when the physical intrusion into her body is carried out by someone other than the prisoner herself; this is the case even when a prisoner is ordered by correctional officers to probe into her own body. Because this new rule is not supported by our prior decisions or consistent with established Fourth Amendment jurisprudence, I respectfully dissent.

In *Hudson v. Palmer*, the Supreme Court held that prisoners do not have a reasonable expectation of privacy as to their living quarters or possessions. 468 U.S. 517, 525–26 (1984). But the Supreme Court has yet to address whether (and to what extent) prisoners maintain a reasonable expectation of privacy as to their persons when it comes to strip searches. Since *Hudson*, this court has taken various, sometimes inconsistent, tacks to answer this question. *Compare Peckham v. Wis. Dep't of Corr.*, 141 F.3d 694, 697 (1998) ("So, does a prison inmate enjoy any protection at all under the Fourth Amendment against unreasonable searches and seizures? … [W]e think the answer is 'yes,'…"); *Canedy v. Boardman*, 16 F.3d 183, 185–86 (7th Cir. 1994) (applying Fourth Amendment reasonableness test espoused in *Bell v. Wolfish*, 441 U.S. 520 (1979), to strip searches),

*with Johnson v. Phelan*, 69 F.3d 144, 147 (7th Cir. 1995) (interpreting "*Canedy* and similar cases" as applying only the Eighth Amendment, not the Fourth); *King*, 781 F.3d at 899–900 (no reasonable expectation of privacy where inmate was required to wear see-through clothes for transport).

Our prior decisions, however, seem to coalesce around the following rule—that prisoners retain a legitimate expectation of privacy as to the insides of their bodies, if not the outsides. And so, in *Forbes v. Trigg*, 976 F.2d 308, 312–13, 315 (1992), we held that "[u]rine tests are searches for Fourth Amendment purposes, and prison inmates retain protected privacy rights in their bodies, although these rights do not extend to their surroundings." *Id.* at 312. In *Del Raine v. Williford*, we explained that a rectal search conducted by a guard "falls under" the protection of the Fourth Amendment. 32 F.3d 1024, 1039 (7th Cir. 1994). And in *Sparks v. Stutler*, we assumed that the involuntary catheterization of an inmate was subject to the Fourth Amendment's protections. 71 F.3d 259, 261–62 (7th Cir. 1995) ("Certainly *Hudson* does not establish that the interior of one's body is as open to invasion as the interior of one's cell.").

This rule, which recognizes an inmate's right to privacy in her body (albeit, we have held, to a limited degree), finds some support in prior Supreme Court decisions. For instance, in *Winston v. Lee*, the Supreme Court held that a criminal defendant's expectation of privacy in the inside of his body rendered unreasonable a compelled surgery to obtain evidence. 470 U.S. 753, 758–60 (1985). And in *Bell*, the Supreme Court assumed without deciding that pretrial detainees had a legitimate expectation of privacy as to body-cavity searches. 441

U.S. at 558; *see also Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326–27 (2012).

At the same time, extending the limiting principle in *Hudson*, we have refused to recognize a reasonable expectation of privacy as to the exterior of inmates' bodies. For instance, in *Johnson*, we held that opposite-sex monitoring in the prison, which led to female guards frequently observing male inmates in various states of undress, did not implicate privacy concerns under the Fourth Amendment. 69 F.3d at 145–47. We reached a similar conclusion in *King*, which involved an inmate who was forced to wear a jumpsuit that was "less than opaque," making his genitals and buttocks visible to those around him. 781 F.3d at 893, 899–900.

But this rule—distinguishing between a prisoner's insides and outsides—has not been pronounced by the Supreme Court or adopted by any other circuit. And its legal foundation has been questioned. *See id.* at 903 (Hamilton, J., concurring in part and concurring in judgment) (noting that "no other circuit applies the categorical rule … finding no Fourth Amendment protection against strip-searches or nudity").

To this, the majority now attaches the added requirement that, for a prisoner to possess a reasonable expectation of privacy as to the interior of her body, the intrusion of her insides must be performed by someone else. And because in this case "each inmate had to manipulate her own body but do not contend that the prison's staff touched any inmate," the majority concludes that the prisoners lacked any reasonable expectation of privacy here.

It seems odd, however, to make the question of whether a prisoner has a reasonable expectation of privacy under the

Fourth Amendment in the integrity of his or her intimate body cavities dependent on who it is that does the probing or penetrating. After all, the applicability of the Fourth Amendment hinges on (1) whether an individual has an actual, subjective expectation of privacy in the subject of the search, and (2) whether that expectation is "one that society is prepared to recognize as reasonable." *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); *see Hudson*, 468 U.S. at 525. The focus of this inquiry is on an individual's expectation of privacy "in *what was searched*," not who did the searching. *United States v. Scott*, 731 F.3d 659, 663 (7th Cir. 2013) (emphasis added); *see United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007) ("[W]hether a legitimate expectation of privacy exists in a particular place or thing must be determined on a case-by-case basis.") (internal quotation marks omitted). The manner in which a search is conducted is more appropriately addressed when assessing its reasonableness. *See Bell*, 441 U.S. at 559.

The facts of this case illustrate the ungainliness of the majority's new rule. Construing the record in Appellants' favor, as we must on summary judgment, approximately 200 female inmates were rounded up early one morning by a tactical team in riot gear. R110-3 at 5. Tightly handcuffed by guards who screamed obscenities at them, the women were taken to the gym, where they remained, handcuffed and standing, until the guards searched them. *Id.* The women were not told what was happening or why. R110-9. This mass strip search of female inmates was conducted solely for training purposes, R.110-6 at 76:7–76:10, but the training was not strictly necessary, as most cadets graduated without it. R974–75.

The searches took place in a beauty salon and a bathroom off the gym. R110-3. Because the beauty shop had mirrored walls, and the bathroom entry was open to the gym, the searches were visible to the people in the gym, including male and female cadets, correctional officers, and civilians. *Id.*

During the searches, the women stood naked in groups of four to ten, so close to one another that their bodies were touching. *Id*. One by one, they were told to raise their breasts, bend over, spread their buttocks to expose their vaginal and anal cavities, and cough. *Id.* Menstruating inmates were forced to extract tampons from inside their bodies. *Id.* The female correctional officers and cadets conducting the searches made derogatory comments and gestures about the women's bodies and odors, telling the women that they were "dirty bitches," R110-9 at 2, "fucking disgusting," "deserve to be in here," R110-9 at 14, and "smell like death." R110-9 at 36. Male correctional officers watched the women from the gym. R110-3.

The majority holds that the female prisoners have no recourse to the Fourth Amendment because it was they themselves who manipulated and intruded upon their own bodies (although, of course, they had no choice because they were ordered to do so). But surely the collecting of urine in *Forbes*, 976 F.2d at 315, the catherization challenged in *Sparks*, *see* 71 F.3d at 261–62, or the rectal probing in *Del Raine*, *see* 32 F.3d at 1039, would not fall outside the Fourth Amendment if the prisoners were forced to perform the acts themselves. The distinction between those cases and this one—in which inmates were ordered to probe their own body cavities and subject them to visual inspection—is difficult to discern.

Our recent decision in *King* did confuse the matter somewhat by drawing a line between "intrusions into [prisoners'] bodies"—which we acknowledged might be unreasonable under the Fourth Amendment—and searches involving no such "intrusion." 781 F.3d at 900. The majority seizes on that language, concluding that any search conducted through only visual means—regardless of the subject of the search (whether insides or outsides) or how that visual inspection was achieved (such as by forcing prisoners to probe and manipulate their own bodies)—is not amenable to Fourth Amendment protection. But I think this reads too much into *King*.

Remember that the initial inquiry under the Fourth Amendment asks whether the person searched has a legitimate expectation of privacy in the place or thing searched—not whether the method of the search implicates a reasonable expectation of privacy. Accordingly, I read *King*'s reference to "intrusions" to merely restate the rule in this circuit that prisoners retain some expectation of privacy in the insides of their bodies; after all, *King* did not involve physical "intrusions" of any kind. The means of a search, in my view, are still more pertinent to the second inquiry under the Fourth Amendment—whether the search conducted was reasonable.

The majority also draws support from the existence of the Eighth Amendment, which it feels is a superior vehicle for Appellants' claims. This position reflects a concern with retaining the subjective component of the Eighth Amendment—the requirement that prisoners seeking to prove "cruel and unusual punishment" show both (1) a violation of their substantive rights and (2) a culpable mental state. *See Whitley v. Albers*, 475 U.S. 312, 319–20 (1986). Because the Fourth

Amendment's inquiry involves only a determination of "reasonableness," the majority posits, applying it to prison officials' conduct "would eliminate the subjective component" required under the Eighth Amendment and would equate convicted prisoners with pretrial detainees.

To be sure, we have recognized that "it is the Eighth Amendment that is more properly posed to protect inmates from unconstitutional strip searches, notably when their aim is punishment, not legitimate institutional concerns." *Peckham*, 141 F.3d at 697; *see also King*, 781 F.3d at 899–900 (distinguishing between the Fourth and Eighth Amendments); *Johnson*, 69 F.3d at 147 (explaining that the Eighth Amendment could be used to "overcome calculated harassment unrelated to prison needs") (quoting *Hudson*, 468 U.S. at 530). But I disagree that the Eighth Amendment is superior in all circumstances, or that the application of the Fourth Amendment in this context would simply be redundant of the Eighth Amendment. *Cf. Peckham*, 141 F.3d at 699 (Easterbrook, J., concurring) ("If the only way to use the fourth amendment in strip-search cases is to make it functionally identical to the cruel and unusual punishments clause, then what's the point?").

First, the notion that prisoners may have overlapping constitutional rights is not an alien concept. In fact, we already recognize that prisoners retain other constitutional rights despite the existence of the Eighth Amendment. For instance, an inmate has due process rights as to discipline received in prison, even though such discipline might be considered "punishment" under the Eighth Amendment. *See Wolff v. McDonnell*, 418 U.S. 539, 555–56 (1974). And an inmate who is barred from practicing his or her religion or from accessing

the courts may turn to the First Amendment for redress. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348–49 (1987); *Hudson*, 468 U.S. at 523. The existence of overlapping rights in the Constitution does not require that one right yield to another, but rather suggests that certain spheres of life are constitutionally entitled to greater protection. As we have seen, religion and speech are two of those areas; I would argue that the right to be free from arbitrary searches by the government of one's insides is another.

Of course, this is not to say that inspections like the one conducted here are categorically prohibited by the Fourth Amendment. The concept of reasonableness under the Fourth Amendment is elastic enough to account for the legitimate needs of prisons, and we always must be mindful that prison administrators should be accorded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547; *see also Florence*, 566 U.S. at 328 (courts should defer to the expert judgment of correctional officers unless substantial evidence indicates that those officers exaggerated their responses to security concerns). Indeed, courts in other circuits typically defer to prison administrators and uphold searches under the Fourth Amendment, unless the intrusion on a prisoner's privacy is widely disproportionate to the purported justification for the search. *See, e.g.*, *Lewis v. Sec'y of Pub. Safety & Corr.*, 870 F.3d 365, 368–69 (5th Cir. 2017) (upholding as reasonable visual body-cavity searches of groups of prisoners returning from work duty); *Nunez v. Duncan*, 591 F.3d 1217, 1226–28 (9th Cir. 2010) (upholding a visual body-cavity search where the prisoner failed to present evidence that it was unreasonable); *Franklin v. Lockhart*, 883 F.2d 654, 656–57 (8th Cir.

1989) (holding that visual body-cavity searches did not violate the Fourth Amendment because they were justified by "legitimate security concerns").

Furthermore, this case illustrates why there is still a distinct role for the Fourth Amendment in prisons. Here, although Appellees now attempt to craft a security-based justification for the searches, the summary judgment record indicates that the primary reason was training. Surely a "training" justification need not be treated with the same level of deference as a search conducted due to concerns over smuggled weapons or other contraband? It is rationales like this—that fall somewhere between legitimate security concerns and unjustified harassment—that suggest the continuing need for the Fourth Amendment even in prisons.

In this case, I would start by asking if the prisoners in question had a legitimate expectation of privacy in the subject of the searches—*i.e.*, in the insides of their bodies and body cavities. To that I would answer yes, and I believe that answer would be supported by precedent in this circuit, although it still needs decisive resolution. *See, e.g.*, *Sparks*, 71 F.3d at 261–62; *Del Raine*, 32 F.3d at 1039; *Forbes*, 976 F.2d at 312–13.

Only after concluding that a protectible interest exists would I address the searches' justification and methodology in the context of deciding whether the searches were reasonable. This question of reasonableness necessarily requires "a balancing of the need for the particular search against the invasion of personal rights that the search entails," including "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559. This two-step approach is precisely what was done in *Florence*. *See* 566 U.S. at

325–38 (considering a variety of administrative factors in determining whether a search was reasonable as to pretrial detainees). Because the district court in this case ended its Fourth Amendment analysis after deciding that Appellants had no legitimate expectation of privacy, I would vacate and remand for full consideration of the reasonableness factors.

As a final note, the peculiar circumstances of this case raise the question of whether the time has come for this Court to reconsider its broader position with respect to the application of the Fourth Amendment to inmates' bodies generally. As the concurring opinion in *King* pointed out, the distinction this Court has drawn between the interior and exterior of a prisoner's body was not required by the Supreme Court in *Hudson* or any subsequent case. *See* 781 F.3d at 902–04 (Hamilton, J., concurring in part and concurring in judgment). And a position recognizing an inmate's expectation of privacy in his or her body—inside and out—would be consistent with that of every other circuit to have addressed this issue; each has assumed the application of the Fourth Amendment and moved on to address the question of reasonableness. *See generally Cookish v. Powell*, 945 F.2d 441, 445–46 (1st Cir. 1991); *Harris v. Miller*, 818 F.3d 49, 62–63 (2d Cir. 2016); *Parkell v. Danberg*, 833 F.3d 313, 327, 330 (3d Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 215 (4th Cir. 2016); *Lewis*, 870 F.3d at 368–69; *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. 2013); *Franklin v. Lockhart*, 883 F.2d 654, 656–57 (8th Cir. 1989); *Nunez*, 591 F.3d at 1226–28; *Farmer v. Perrill*, 288 F.3d 1254, 1260 (10th Cir. 2002); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993).

For these reasons, I respectfully dissent.