In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-1769

MARSHALL KING,

*Plaintiff-Appellant,*

*v.*

ROBERT MCCARTY, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 11-cv-1126—**Joe Billy McDade**, *Judge.*

ARGUED APRIL 18, 2014 — DECIDED MARCH 27, 2015

Before BAUER, EASTERBROOK, and HAMILTON, *Circuit Judges.*

PER CURIAM. Marshall King, the plaintiff in this civil rights lawsuit, complains that he was forced to wear a see-through jumpsuit that exposed his genitals and buttocks while he was transported from a county jail to state prison. He contends that this amounted to an unjustified and humiliating strip-search that violated his rights under the Fourth

and Eighth Amendments to the federal Constitution. The
district court reviewed King's complaint as required by the
Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915A. The
court determined that King had not stated a viable claim
under the Eighth Amendment for cruel and unusual pun-
ishment but allowed him to proceed on his Fourth Amend-
ment theory of an unreasonable search. The district court
later granted summary judgment for the defendants on the
Fourth Amendment claim on the ground that King had
failed to comply with the Prison Litigation Reform Act's re-
quirement that he exhaust the jail's available administrative
remedies before suing. See 42 U.S.C. § 1997e(a). King has
appealed.

We reverse and remand for further proceedings. King's
transfer to the state prison facility made it impossible for
him to comply with the jail's specified grievance procedures,
so there were no available remedies to exhaust. We also re-
verse the court's dismissal of King's Eighth Amendment
claim. He has alleged a plausible Eighth Amendment claim
that the use of the unusual jumpsuit had no legitimate cor-
rectional purpose but was instead used to humiliate and in-
flict psychological pain. See *Calhoun v. DeTella*, 319 F.3d 936,
939 (7th Cir. 2003) (reversing dismissal of Eighth Amend-
ment claim based on strip-search). We also conclude, how-
ever, that, as a convicted prisoner, King is not entitled to
proceed on remand with his theory that requiring him to
wear the jumpsuit subjected him to an unreasonable search
in violation of the Fourth Amendment.

I. *Factual and Procedural Background*

King was convicted of violating Illinois's armed habitual
criminal statute. See 720 Ill. Comp. Stat. 5/24-1.7. After sen-

tencing, he was transferred from the Livingston County Jail to an intake facility run by the Illinois Department of Corrections. Pursuant to jail policy, King was strip-searched before departure and told to change into a jumpsuit. The parties dispute the exact characteristics of this garment. King describes it as "a see-through jumpsuit that visually expose[d] his genitals and buttocks," and he says the guards refused to give him undergarments to cover himself. Defendants (the county sheriff and two guards at the jail) deny that the jumpsuit was transparent but concede it was "less than opaque." And while insisting the jumpsuit was not see-through, they defend the policy on the ground that see-through garments are crucial to ensure security and safety during transfer. The jumpsuit's actual appearance remains a mystery at this point because the defendants have so far resisted King's discovery requests.

Whatever the outfit's opacity, King says that he complained about it to the guards. According to his account, they responded by laughing at him and telling him to be grateful he was not being transferred in winter. After changing into the jumpsuit, King was shackled together with other prisoners and driven to the state intake facility. Upon arrival, he and the other transferees waited for several hours in the presence of male and female guards before being processed and strip-searched again. King noticed that inmates from other jails were not similarly clad. He says his hours-long exposure in front of male and female guards and other male inmates caused him pain and humiliation and had no valid justification, especially in light of the fact that he had been strip-searched already and remained shackled and under surveillance throughout the transfer.

II. *Exhaustion of Administrative Remedies*

We begin our analysis with the district court's grant of summary judgment for the defendants based on King's failure to exhaust as required by 42 U.S.C. § 1997e(a). That provision bars lawsuits challenging prison conditions unless the prisoner has first exhausted "such administrative remedies as are available." See generally *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002) (explaining details and purpose of exhaustion rule). The exhaustion requirement is strict. A prisoner must comply with the specific procedures and deadlines established by the prison's policy. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The prisoner must do so even if he expects the process will ultimately be futile, *Booth v. Churner*, 532 U.S. 731, 741 (2001); *Perez v. Wisconsin Dep't of Corrections*, 182 F.3d 532, 536 (7th Cir. 1999).

At the same time, the statute requires exhaustion only of remedies that are "available." Prison authorities cannot immunize themselves from suit by establishing procedures that in practice are not available because they are impossible to comply with or simply do not exist. See *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) ("we refuse to interpret the PLRA so narrowly as to permit prison officials to exploit the exhaustion requirement through indefinite delay") (internal formatting omitted); *Johnson v. Litscher*, 260 F.3d 826, 829 (7th Cir. 2001) ("For the exhaustion requirement to apply, there must be some administrative remedy to exhaust."). Failure to exhaust is an affirmative defense that a defendant has the burden of proving. *Westefer v. Snyder*, 422 F.3d 570, 577 (7th Cir. 2005); *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999).

King stayed at the state intake facility for approximately one week before he was moved to the state prison. For the

first time since his transfer, he then had access to writing materials. He says that he wrote to the Livingston County Jail to complain about the jumpsuit and to request the proper form to pursue the grievance process. He received no response. After trying to pursue administrative remedies with the state Department of Corrections, whose officials told King they had no authority over the county jail's decisions about clothing, King filed this suit under 42 U.S.C. § 1983 seeking damages and any other appropriate relief. See *Calhoun v. DeTella*, 319 F.3d 936, 941–43 (7th Cir. 2003) (explaining availability of nominal and punitive damages in prisoner suits alleging constitutional harm without physical injury); see also *Smith v. Peters*, 631 F.3d 418, 421 (7th Cir. 2011) (collecting similar cases from other circuits).

Because King was transferred between facilities, each with its own grievance procedure, a preliminary question is which process he was required to pursue. The administrative remedies a prisoner must exhaust are established and defined by state law. *Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002). Illinois has no rule directly addressed to transferees in King's position, but the grievance procedure established by the state board of corrections says that it "shall not be utilized for complaints regarding decisions that are outside the authority of the Department." Ill. Admin. Code. § 504.810. The county jail's jumpsuit policy seems to fall outside the state agency's authority, meaning that King had to take his complaint to the county jail and not the state prison.

In the absence of state law provisions to the contrary, prisoners such as King must direct their grievances to the entity allegedly responsible for the conditions they wish to

challenge. See *Ortiz v. Forbes*, No. 11 C 4145, 2012 WL 5389708, at *2 (N.D. Ill. Oct. 30, 2012) (in case alleging constitutional violation in jail before transfer to state prison, "the analytical starting point is the transferor jail's regulations"); *Cunningham v. Grozik*, No. 01 C 6657, 2002 WL 1777278, at *5 (N.D. Ill. Aug. 1, 2002) (rejecting as "frivolous" defendants' argument that prisoner moved from county jail to state prison had to exhaust state prison's grievance procedure for claim regarding inadequate medical care in jail before transfer). This rule is consistent with the regulation quoted above, and it should promote efficiency and allow the relevant authorities a chance to remedy their own errors before being haled into court—the two purposes the Supreme Court has identified behind the exhaustion requirement. See *Woodford*, 548 U.S. at 89. We therefore agree with the parties and the district court that § 1997e(a) required King to exhaust available remedies established by the county jail.

The Livingston County Jail details its grievance procedure in a handbook given to all detainees upon arrival. A detainee must first attempt to resolve a dispute informally before filing an official complaint. If the informal attempt fails, a detainee is supposed to be able to obtain an official grievance form from certain guards at the jail. The official form must be submitted within five days of the incident that prompted the complaint. The superintendent of the jail then designates a "grievance officer" to investigate the reported incident. The detainee can appeal the resulting decision to the superintendent.

The defendants contend that King did nothing to pursue the jail's administrative remedy. Their only evidence is an affidavit from the former superintendent of the jail stating

that the jail never received a request from King about the grievance procedure. If it had, the superintendent says, the request would have been sent to a grievance officer.

King has responded with a number of affidavits and sworn pleadings stating that: (1) he tried to resolve his complaint informally by complaining to the guards on the day of his transfer; (2) he lacked access to writing materials with which to request the grievance form until more than a week after his transfer; and (3) he wrote to the jail as soon as he could, explaining his complaint and requesting the proper paperwork, but never received a response.

Summary judgment is appropriate only where the moving parties can show there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013). The undisputed material facts do not show that the defendants are entitled to judgment as a matter of law on the defense of failure to exhaust administrative remedies.

First, the defendants have offered no evidence suggesting that King failed to exhaust the policy's informal-resolution requirement. They deny King's sworn account that he explained his problem with the jumpsuit to the guards at the time of his transfer. But the defendants failed even to cite any support in the record for their version of the story, as required by Rule 56(c)(1), let alone meet the summary judgment burden of showing that the material facts are undisputed in their favor. See *Adickes v. S. H. Kress & Co.*, 398 U.S.

144, 157 (1970) (reversing summary judgment where moving party's submission was not adequate). Nor did they present any evidence showing how a transferee could informally resolve a complaint about conditions at the jail while confined in a different facility.

Second, nothing in the record shows beyond reasonable dispute that the grievance form, which King had to file within five days of his transfer to satisfy the jail's policy, remained available to him. The parties disagree about whether King ever wrote asking for the form—a dispute of fact that could not be resolved against him on summary judgment—but we think that question is ultimately beside the point. Even if King had been able to write on the same day he was transferred, it is not plausible that he could have asked for the form, received a response, and mailed back the completed paperwork before the five-day deadline had passed. The jail has imposed a timetable that makes it practically impossible for transferred prisoners to pursue their grievances about the transfer process. The form was not available to King, so he was not required to submit it before suing. See *Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004) (because guards refused to provide specific form required to file grievance, defendants could not show failure to exhaust).

The defendants cannot avoid this conclusion by relying on the superintendent's statement that any letter from a transferred prisoner would have been given to a grievance officer. The district court interpreted that statement to mean the jail would have considered King's grievance on the merits even if he did not use the proper form or submit his complaint on time. The court concluded on that basis that the remedy remained available.

The first problem with this conclusion is that it does not follow from what the superintendent actually said. Her affidavit said only that any letter from King would have been given to a grievance officer. Such a letter would still have failed to conform to the procedural requirements of the jail's policy and could have been thrown out on that basis. In effect, the district court reversed the summary judgment standard by viewing the superintendent's statement in the light *least* favorable to the non-moving party.

But even if the affidavit had actually said that a late grievance from King would have been considered on the merits, there is a still more fundamental problem with the defendants' argument. The jail detailed its grievance policy in the detainee handbook. To the extent the policy was available to King, he was required to follow its specific procedures. *Woodford*, 548 U.S. at 93. Now that a prisoner has sued them, though, the defendants cannot defeat the suit by retroactively amending the policy with a new rule or policy that says, in effect, "we would have been reasonable." Nothing in the record suggests, but more important, nothing in the jail's stated policy shows beyond reasonable dispute, that the jail would have or could have accepted a late submission or otherwise relaxed its stated rules. See *Dale*, 376 F.3d at 656 (vacating summary judgment; defendants could not argue that they would have accepted prisoner grievance even if not filed on the specific form required by administrative policy).

Prisoners are required to exhaust grievance procedures they have been told about, but not procedures they have not been told about. See *Pavey v. Conley*, 663 F.3d 899, 906 (7th Cir. 2011); *Curtis v. Timberlake*, 436 F.3d 709, 712 (7th Cir. 2005); *Carroll v. Yates*, 362 F.3d 984, 985 (7th Cir. 2004). They

are not required to divine the availability of other proce-
dures. If authorities could change their grievance rules once
litigation began or simply keep prisoners in the dark about
the real rules, they could always defeat prisoner suits by an-
nouncing impossible procedural hurdles beforehand and
then, when they are sued, explaining that they would have
waived the requirements for the plaintiff. See *Kaba v. Stepp*,
458 F.3d 678, 686 (7th Cir. 2006) (reversing summary judg-
ment for defendants; where prison officials argued they
would have permitted late grievance after transfer, it was
unknown both whether late grievance would be considered
*and whether prisoner had way to know a late grievance might be
considered*); *Dale*, 376 F.3d at 656 (vacating summary judg-
ment for defendants; prisoner offered evidence that prison
officials refused his request for required grievance form; of-
ficials argued on appeal that prisoner was not required to
use specified form but pointed to no regulation that would
excuse failure to use required form). The Prison Litigation
Reform Act was not meant to impose the rule of "heads we
win, tails you lose" on prisoner suits. See *Kaba*, 458 F.3d at
684 ("Prison officials may not take unfair advantage of the
exhaustion requirement"), quoting *Dole v. Chandler*, 438 F.3d
804, 809 (7th Cir. 2006).

In short, the defendants did not show that they were enti-
tled to summary judgment as a matter of law. In fact, the
record at this point demonstrates the contrary. The jail's ad-
ministrative remedy was simply not available to transferred
prisoners challenging their treatment during the transfer.
The exhaustion requirement in 42 U.S.C. § 1997e(a) is not a
barrier to King's claims.

III. *The Eighth Amendment Claim*

The district court screened King's complaint for cognizable claims as required by the Prison Litigation Reform Act. 28 U.S.C. § 1915A. The court concluded that King could proceed on his claim under 42 U.S.C. § 1983 that being forced to wear a transparent jumpsuit during his transfer violated the Fourth Amendment. But the court dismissed King's parallel claim under the Eighth Amendment, relying on our decision in *Johnson v. Phelan*, 69 F.3d 144 (7th Cir. 1995). *Johnson* held that female guards' routine monitoring of naked male inmates in a jail's showers, toilets, and cells did not involve the sort of unnecessary infliction of pain or discomfort that is required to state a claim for cruel and unusual punishment. The district court also concluded that because the jumpsuits were part of the jail's usual transfer policy, it was implausible that they were meant for harassment rather than for a legitimate penological purpose.

Claims such as King's require that we consider the larger tension between the privacy and dignity of prisoners and the pressing institutional needs for security and safety. Courts give wardens substantial deference in pursuing the latter ends, but that deference is not complete. The Supreme Court made this point in *Brown v. Plata*, 563 U.S. —, 131 S. Ct. 1910, 1928–29 (2011), when it emphasized that courts "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." Although prisoners are deprived of many rights during their incarceration, they "retain the essence of human dignity inherent in all persons." *Id.* at 1928.

King should be allowed to pursue his Eighth Amendment claim beyond the pleadings. *Johnson* does not foreclose

at the pleading stage King's allegation that being unneces-
sarily paraded in a see-through jumpsuit was cruel and unu-
sual punishment. Nor should the district court have decided
on the pleadings that the jumpsuit was justified simply be-
cause the jail imposed it on all transferred detainees.

A strip-search in jail or prison can be cruel and unusual
punishment. See *Mays v. Springborn*, 575 F.3d 643, 649 (7th
Cir. 2009); *Peckham v. Wisconsin Dep't of Corrections*, 141 F.3d
694, 697 (7th Cir. 1998). A prisoner states a claim under the
Eighth Amendment when he plausibly alleges that the strip-
search in question was motivated by a desire to harass or
humiliate rather than by a legitimate justification, such as the
need for order and security in prisons. See *Calhoun v. DeTella*,
319 F.3d 936, 939 (7th Cir. 2003); *Meriwether v. Faulkner*, 821
F.2d 408, 418 (7th Cir. 1987); see also *Hudson v. Palmer*, 468
U.S. 517, 530 (1984) (Eighth Amendment protects against
"calculated harassment unrelated to prison needs"). Even
where prison authorities are able to identify a valid correc-
tional justification for the search, it may still violate the
Eighth Amendment if "conducted in a harassing manner in-
tended to humiliate and cause psychological pain." *Mays*,
575 F.3d at 649 (reversing summary judgment for defend-
ants). In short, where there is no legitimate reason for the
challenged strip-search or the manner in which it was con-
ducted, the search may "involve the unnecessary and wan-
ton infliction of pain" in violation of the Eighth Amendment.
*Rhodes v. Chapman*, 452 U.S. 337, 346 (1981), quoting *Gregg v.
Georgia*, 428 U.S. 153, 173 (1976).

These decisions under the Eighth Amendment do not
conflict with the Supreme Court's more recent decision in
*Florence v. Board of Chosen Freeholders*, 566 U.S. —, 132 S. Ct.

1510 (2012), which held that a county jail did not violate detainees' Fourth Amendment rights by applying its policy of strip- and body cavity searches for all detainees entering the jail's general population. See *id*. at 1523 (Roberts, C.J., concurring); *id*. at 1524 (Alito, J., concurring). The majority opinion retained a standard of reasonableness—"correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband"—while recognizing that courts should ordinarily defer to correctional officials' judgments about the reasonableness of such a policy. *Id*. at 1517. *Florence* did not address, however, issues presented by correctional officers "engaging in intentional humiliation and other abusive practices." *Id*. at 1523 (plurality).

King has stated a viable claim that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. He complains that he was degraded and humiliated by being transported in a see-through jumpsuit that left him exposed in front of other inmates as well as guards of both sexes. Such compelled and prolonged nudity seems to be, for present purposes, analogous to a lengthy strip-search. King asserts that there was no legitimate reason for this policy, a point he supports with specific factual allegations. Detainees arriving at the intake facility from other jails were not wearing similar garments, which at least tends to suggest that such clothing is not necessary for safe and secure penal transfers. Moreover, King was strip-searched before and after his transfer, and he remained shackled and under surveillance throughout. These facts tend to suggest there was no security reason for keeping transferees in a state of semi-nudity. Moreover, King's allegation that he was mocked when he objected to the jumpsuit is enough at this

stage to raise at least the possibility that the policy was driven by a desire to humiliate or harass. See, e.g., *Calhoun*, 319 F.3d at 939 (reversing dismissal where prisoner alleged he was subjected to strip searches conducted in deliberately harassing and humiliating way).

Our decision in *Johnson v. Phelan* is not to the contrary. That case involved female guards monitoring male prisoners in their bathrooms, showers, and cells, where the inmates were sometimes by necessity in varying states of undress. The plaintiff objected to being exposed in front of guards of the opposite sex. We affirmed dismissal of the complaint, holding that the policy of cross-sex monitoring was not meant to cause pain or humiliation but instead served several valid institutional goals. One was to avoid Title VII or equal protection problems by removing a basis on which the jail would have to distinguish between its male and female employees. The plaintiff in *Johnson* did not claim he was forced to disrobe for no reason, only that he and other prisoners were monitored by female guards in the shower or toilet, when they would already be naked.

King challenges a much different policy of compelled, continuing, and public undress without any obvious justification for the treatment. Like the plaintiff in *Johnson*, King objects to the presence of female guards, but that is not the basis of his complaint. He has described instead a broader constitutional problem, one that does not depend solely on the sex of the guards. (For this reason, the Title VII and equal protection concerns in *Johnson* for women employed as guards do not seem relevant to King's claims.) The unusual practice alleged here, if supported by the facts, looks more

like an unjustified effort to humiliate prisoners than did the routine supervision of prisoners in *Johnson*.

*Johnson* also undermines the district court's reasoning that because the jumpsuits were part of the jail's standard transfer policy, they could not have been intended to harass or humiliate. The monitoring in *Johnson* was done pursuant to regular policy, but we did not and could not resolve the plaintiff's claim on that basis. See 69 F.3d at 145; cf. *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004) (prison's drug-testing program did not violate Eighth Amendment because its specific procedures were required to ensure accurate testing). A jail cannot shield a cruel and unusual punishment from legal challenge simply by imposing it on everyone equally. That would serve only to magnify the constitutional problem.

IV. *The Fourth Amendment Claim*

In reviewing King's complaint, the district court concluded that he stated a potentially viable claim for violation of his Fourth Amendment rights, which requires that searches be conducted in a reasonable manner. On this point, we disagree with the district court. In the end, it was correct to dismiss King's Fourth Amendment claim, but it should have been on the merits rather than for failure to exhaust administrative remedies. On remand, the district court should not allow King to pursue a Fourth Amendment theory for relief.

As noted, King argues that he was subjected to an unusual and unreasonable form of prolonged strip-search. See *Johnson*, 69 F.3d at 145 ("Observation is a form of search, and the initial question therefore is whether monitoring is 'unreasonable' under the fourth amendment."). At the time of

the alleged search, however, King was a convicted offender in custody for purposes of punishment. The Supreme Court has never applied the Fourth Amendment to such a claim based on the treatment of a convicted prisoner in prison.

In *Hudson v. Palmer*, 468 U.S. 517 (1984), the Supreme Court adopted a bright-line rule and held that a prison inmate had simply no reasonable expectation of privacy in his prison cell that would protect him under the Fourth Amendment from unreasonable searches and seizures of his property. The *Hudson* opinion also said, more broadly, that a "right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 527–28.

After *Hudson*, the lower federal courts have considered whether its holding extends from searches of prisoners' property to searches of their bodies. A key difference between the Fourth and Eighth Amendments is relevant. For reasons we explained above, King's claim under the Eighth Amendment survives at least at the pleading stage, but that claim will require him to prove that the defendants acted without a legitimate correctional purpose and for the purpose of humiliating him and/or subjecting him to gratuitous psychological injury. See, e.g., *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (for conduct that "does not purport to be punishment at all," it is "obduracy and wantonness, not inadvertence or error in good faith" that characterizes actions prohibited by the Eighth Amendment). In other words, the defendants' subjective purposes and states of mind are part of the relevant considerations (even if they might be the subject of objective, circumstantial evidence).

The Fourth Amendment imposes, by contrast, an objective standard of reasonableness, so King argues he can prevail under the Fourth Amendment without necessarily having to prove the defendants acted with bad intent. Even under the Fourth Amendment's objective standard, courts give considerable deference to judgments of prison officials about matters of institutional safety and security, but the deference is not complete. See, e.g., *Conyers v. Abitz*, 416 F.3d 580, 584 (7th Cir. 2005), citing *Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979).

In *Johnson*, we considered the difference between the Fourth and Eighth Amendments in the context of the jail policies that exposed naked male prisoners to view by female guards. Johnson lost under the Fourth Amendment because we held that he had no protected privacy interest. He lost under the Eighth Amendment because there were legitimate correctional purposes for subjecting male prisoners to view of female guards: more efficient use of staff and greater employment opportunities for women. 69 F.3d at 147–48; see also *Sparks v. Stutler*, 71 F.3d 259, 260–61 (7th Cir. 1995) (distinguishing between Fourth and Eighth Amendment claims based on involuntary catherization of prisoner to extract urine for drug test; reversing Fourth Amendment judgment for plaintiff based on defense of qualified immunity).

Even in prison, case law indicates that the Fourth Amendment protects, to some degree, prisoners' bodily integrity against unreasonable intrusions *into* their bodies. See *Sparks*, 71 F.3d at 260–61 (insertion of catheter into prisoner's bladder was subject to Fourth Amendment, but defendant physician was entitled to qualified immunity); *Peckham v. Wisconsin Dep't of Corrections*, 141 F.3d 694, 699 (7th Cir. 1998)

(Easterbrook, J., concurring in judgment) (Fourth Amendment protects prisoners from unreasonable bodily intrusions but not inspections of appearance of their bodies); see also *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 44–48 (1st Cir. 2009) (vacating dismissal of prisoner's Fourth Amendment claim based on abdominal surgery used to search for evidence).

We said broadly in *Johnson v. Phelan* that *Hudson* held that prisoners retain no right of privacy under the Fourth Amendment. 69 F.3d at 146. We have also said in other cases, however, that the Fourth Amendment continues to protect some degree of privacy for convicted prisoners, at least when it comes to bodily searches, even if that protection is significantly lessened by punitive purposes of prison and the very real threats to safety and security of prisoners, correctional staff, and visitors. See *Peckham*, 141 F.3d at 697 (stating in dictum regarding strip-searches that prisoners retain some protection "under the Fourth Amendment against unreasonable searches and seizures"). And in *Canedy v. Boardman*, 16 F.3d 183 (7th Cir. 1994), we reversed dismissal of a prisoner's claim that his rights were violated by routine observation and even strip-searches by opposite-sex guards, though in the similar *Johnson* case, we interpreted the *Canedy* discussion of "privacy" as an invocation of the Eighth Amendment prohibition on cruel and unusual punishments and cautioned against reading *Canedy* too broadly. 69 F.3d at 147–48.

King has not alleged any intrusion into his body like those at issue in *Sparks* and *Sanchez*, so even if we assume such treatment of a convicted prisoner is subject to the Fourth Amendment, he has failed to state a viable claim. We draw support for the line we draw from the Supreme Court's

decision in *Florence*, where the issue was whether routine visual strip-searches of pretrial detainees, without individualized suspicion that a detainee was concealing contraband, were reasonable under the Fourth Amendment. The Court allowed such searches but made clear that its opinion did not address searches in which detainees would be touched as part of the searches. See 132 S. Ct. at 1515, 1523. King, who was at the time of his transfer no longer a pretrial detainee but a convicted prisoner, alleges only a form of prolonged visual search in which he was not touched.

The Supreme Court has adhered to the importance of the subjective element of Eighth Amendment claims by convicted prisoners like King, and the Court has never extended Fourth Amendment protection to a prisoner's claim like King's. In light of those facts, we do not believe we should expand the scope of Fourth Amendment protection to strip-searches of convicted prisoners to create an Eighth-Amendment-light standard in which the subjective purposes of prison officials would not be relevant. We conclude that King has failed to state a claim upon which relief may be granted under the Fourth Amendment.

The decisions of the district court dismissing King's Eighth Amendment claim and granting summary judgment for the defendants on the defense of failure to exhaust administrative remedies are REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

HAMILTON, *Circuit Judge*, concurring in part and concurring in the judgment. I concur in the judgment reversing and remanding this case to the district court, and I join Parts I, II, and III of the court's opinion, which hold that defendants are not entitled to summary judgment on the defense of failure to exhaust administrative remedies and that King has alleged a viable claim for cruel and unusual punishment under the Eighth Amendment. The court's opinion provides helpful clarification of the PLRA's requirement to exhaust administrative remedies, particularly where circumstances make it impossible for a prisoner to comply with express requirements of a jail's grievance procedure. I respectfully disagree, however, with Part IV, which rejects King's Fourth Amendment claim on the pleadings and instructs the district court not to consider it on remand.

I do not believe the boundary for the protections provided by the Fourth Amendment to a convicted prisoner is the surface of the prisoner's skin, as my colleagues suggest (though they leave open the possibility that no Fourth Amendment protection at all is available to a convicted prisoner). In fact the majority's Fourth Amendment reasoning goes further than the Supreme Court itself and other circuits have gone. The Fourth Amendment requires law enforcement officials to act in a reasonable manner when they subject people to searches of their person or property. It is well established that observation of a nude detainee is a search for purposes of the Fourth Amendment. See, e.g., *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. — 132 S. Ct. 1510 (2012); *Johnson*, 69 F.3d at 145 ("Observation is a form of search, and the initial question therefore is whether monitoring [of naked male prisoners by female guards] is 'unreasonable' under the fourth amendment.").

To be sure, those who are detained in connection with proven or suspected criminal activity have sharply diminished expectations of privacy—none when it comes to their property and only very limited rights when it comes to their bodies. Moreover, courts give deference to the judgment of jail or prison staff in determining what searches are reasonable. See *Florence*, 132 S. Ct. at 1517; *Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979).

But I do not believe that convicted prisoners have utterly no Fourth Amendment rights, at least when it comes to rights of bodily integrity. Consider, for example, the intrusions into an inmate's body in *Winston v. Lee*, 470 U.S. 753 (1985), which barred surgery on a pretrial detainee to recover evidence, and in *Sparks v. Stutler*, 71 F.3d 259, 260–61 (7th Cir. 1995), where the convicted prisoner was subjected to involuntary catheterization of his bladder. King's allegations describe an unusual form of prolonged search that he alleges was unreasonable.

The Supreme Court has not held that prisoners have *no* Fourth Amendment right to bodily privacy. In *Bell v. Wolfish*, 441 U.S. 520, 558 (1979), the Court assumed but did not decide that the Fourth Amendment protected convicted inmates against unreasonable strip-searches, including visual inspection of bodily cavities. And as Chief Justice Burger wrote: "Inmates in jails, prisons, or mental institutions retain certain fundamental rights of privacy; they are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters, however 'educational' the process may be for others." *Houchins v. KQED, Inc.*, 438 U.S. 1, 5 n.2 (1978) (plurality opinion of Burger, C.J.) (news media did

not have constitutional right of access to secure portions of jail for purpose of gathering news).

The Supreme Court later held in *Hudson v. Palmer* that the Fourth Amendment does not apply to searches of prison cells because prisoners have no legitimate expectation of privacy in their property or surroundings. The *Hudson* opinion said in its broadest statement that a "right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." 468 U.S. at 527–28.

Despite that broad language, the holding of *Hudson* was expressly limited to searches of prisoners' cells and belongings, not their bodies. See *id.* at 536 ("We hold that the Fourth Amendment has no applicability to a prison cell."). The narrow scope of the decision was reflected in Justice O'Connor's concurrence, which reiterated that the Court was addressing inmates' "privacy and possessory interests in personal effects" and "searches and seizures of the contents of an inmate's cell." *Id.* at 536–40. We recognized that limit in *Sparks*, which presented a Fourth Amendment claim based on involuntary catherization of a prisoner to obtain a urine sample for drug testing. See 71 F.3d at 261 ("*Hudson* did not require the Court to decide what interests prisoners retain in their bodies, as opposed to their surroundings. … Certainly *Hudson* does not establish that the interior of one's body is as open to invasion as the interior of one's cell.").

*Hudson* was a case about prisoners' privacy interest in their property and surroundings, and its reference to the surveillance of inmates means simply that: observing prisoners in their cells. So while *Hudson* helped guide our deci-

sion in *Johnson*, where inmates were routinely monitored while in their cells and showers, it did not foreclose Fourth Amendment challenges to more intrusive and/or less justifiable bodily searches like the one King has alleged. See, e.g., *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 44–48 (1st Cir. 2009) (reversing dismissal of convicted prisoner's Fourth Amendment claim for unreasonable search in the form of exploratory surgery to search for contraband, even though search had legitimate correctional goal).

Our court has on occasion used broad language that denies prisoners essentially any legitimate expectation of privacy, even with respect to their own bodies. See *Johnson*, 69 F.3d at 146 (reading *Hudson v. Palmer* as holding that prisoners do not retain any right of privacy under the Fourth Amendment); *Green v. Berge*, 354 F.3d 675, 679 (7th Cir. 2004) (Easterbrook, J., concurring) (prisoners' privacy interests "are extinguished by judgments placing them in custody"). But *Johnson* is the outlier on this issue.

In other cases, both before and after *Johnson*, we have recognized that the Fourth Amendment continues to protect some very limited degree of privacy in prisons, at least when it comes to strip-searches, even if that protection is significantly lessened by the very real dangers of incarceration. See *Peckham*, 141 F.3d at 697 (prisoners retain some protection "under the Fourth Amendment against unreasonable searches and seizures"); *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) ("those who are convicted of criminal offenses do not surrender all of their constitutional rights"). That's why we have allowed prisoners to proceed on Fourth Amendment challenges to bodily searches instead of dismissing their claims. See *May v. Trancoso*, 412 F. App'x 899,

904 (7th Cir. 2011) (non-precedential order) (affirming summary judgment for defendants; prisoner drug test was not unreasonable); *Forbes v. Trigg*, 976 F.2d 308, 312 (7th Cir. 1992) (affirming summary judgment for defendants in case challenging requirement that prisoner produce urine for drug test, but noting that "inmates retain protected privacy rights in their bodies"). While I do not find persuasive the *Johnson* majority's effort to distinguish *Canedy* (by saying it must have been limited to the Eighth Amendment), a single panel obviously cannot resolve this tension in our circuit's case law.[1]

All of the other courts of appeals except the Federal Circuit (which would rarely if ever have occasion to consider the question) have said that prisoners retain *some* diminished degree of protection against unreasonable bodily searches and/or have allowed such challenges to go forward. As best I can tell, no other circuit applies the categorical rule that my colleagues apply, finding no Fourth Amendment protection against strip-searches or nudity. See, e.g., *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 44–48 (1st Cir. 2009) (vacating dismissal of prisoner's Fourth Amendment claim based on abdominal surgery to obtain evidence); *Nicholas v. Goord*, 430 F.3d 652, 658 (2d Cir. 2005) ("prisoners retain a right to bodily privacy," but DNA testing did not violate Fourth Amendment); *Russell v. City of Philadelphia*, 428 F. App'x 174, 178 (3d Cir.

---

[1] In *Johnson*, which is very difficult to reconcile with *Canedy* on this point, a petition for rehearing en banc was denied by a vote of five to four, with two judges not participating. See 69 F.3d at 144 n*. *Peckham* did not draw a petition for rehearing en banc, perhaps because the judges who disagreed on the general legal issue agreed on the judgment affirming summary judgment for the defendants. See 141 F.3d at 697.

2011) (prisoner stated claim challenging strip-search under Fourth Amendment but failed to exhaust administrative remedies); *Bushee v. Angelone*, 7 F. App'x 182, 184 (4th Cir. 2001) (vacating dismissal of prisoner's challenge to reasonableness of strip-search); *Hutchins v. McDaniels*, 512 F.3d 193, 196 (5th Cir. 2007) (reversing dismissal of prisoner's Fourth Amendment claim based on strip-search); *Stoudemire v. Michigan Dep't of Corrections*, 705 F.3d 560, 575 (6th Cir. 2013) (affirming denial of qualified immunity against prisoner's Fourth Amendment claim challenging strip-search); *Seltzer-Bey v. Delo*, 66 F.3d 961, 963 (8th Cir. 1995) (reversing summary judgment and remanding prisoner's Fourth Amendment claim challenging strip-search); *Nunez v. Duncan*, 591 F.3d 1217, 1226–28 (9th Cir. 2010) (affirming summary judgment for defendants on merits of prisoner's Fourth Amendment claim; he presented no evidence that strip-search was unreasonable); *Farmer v. Perrill*, 288 F.3d 1254, 1260 (10th Cir. 2002) (affirming denial of qualified immunity against prisoner's challenge to strip-search); *Moton v. Walker*, 545 F. App'x 856, 860 (11th Cir. 2013) (affirming grant of qualified immunity while noting that prisoners "retain a constitutional right to bodily privacy"); *Kaemmerling v. Lappin*, 553 F.3d 669, 686 (D.C. Cir. 2008) (affirming dismissal of prisoner's challenge to DNA testing because past case established its reasonableness).

With only the pleadings before us on this claim, I believe it is a mistake to attempt now to draw precise boundaries under the Fourth Amendment. In *Florence* the Supreme Court took care to limit its decision and to leave room for future modification and exceptions. 132 S. Ct. at 1522–23; see also *id*. at 1523 (Roberts, C.J., concurring) ("The Court is nonetheless wise to leave open the possibility of exceptions,

to ensure that we not 'embarrass the future.'"); *id*. at 1524–25
(Alito, J., concurring) (praising limits on Court's opinion).
We should exercise similar caution here. At this preliminary
stage of this case, we should recognize that the Fourth
Amendment's focus on objective reasonableness may pre-
serve some outer limit on the actions of even well-meaning
prison administrators where such bodily searches are in-
volved, while it also requires courts to give substantial—but
not complete—deference to the warden's judgment. The un-
certain scope of the law might well allow individual defend-
ants to rely on qualified immunity to avoid damages liabil-
ity, of course, but Armstrong has also asserted a practice or
policy claim against the sheriff in his official capacity under
*Monell v. Department of Social Services*, 436 U.S. 658 (1978). We
should allow further factual development on this claim in
the district court on remand.