In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2881

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

NORMAN SHAW, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:13-cr-10105-JES-JEH-1 — **James E. Shadid**, *Chief Judge.*

ARGUED FEBRUARY 17, 2016 — DECIDED MAY 27, 2016

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendant-appellant, Norman Shaw, is an inmate at the Federal Correctional Institute in Pekin, Illinois ("FCI-Pekin"). He appeals his conviction for possession of heroin while in a federal prison. He represented himself *pro se* at trial, and now raises seven issues on appeal. We affirm his conviction and sentence.

Shaw, a convicted bank robber, has been imprisoned at FCI-Pekin since 2005. The prison has a phone hotline that inmates

may anonymously use to inform correctional personnel of any issues. On August 1, 2012, David McDonough, a lieutenant in the prison's Special Investigation Services, received two anonymous calls via this tip line. Both calls alleged that Shaw possessed heroin.

McDonough instructed Correctional Officer Darrin Herrmann to find and strip search Shaw. Shaw was in a common area outside of his cell when Herrmann approached. Herrmann grabbed Shaw's left shoulder and told Shaw to "cuff up"—to put his hands behind his back so that Herrmann could apply handcuffs. After applying the handcuffs, Herrmann led Shaw to the lieutenants' bathroom. As they approached the bathroom, Shaw said, "[O]kay, you got me. I have some weed in my pocket." After they entered the bathroom, Herrmann searched Shaw's clothing, and found some tissue paper that appeared to contain marijuana.

Hermann then told Shaw to undress. Shaw refused. Correctional Officer Ricky Hayes arrived in the bathroom and also commanded Shaw to undress, but Shaw continued to refuse. Hayes then called the senior officer on duty, Lieutenant Rivera, and asked him to come to the bathroom. Rivera arrived, and Shaw eventually agreed to undress. Herrmann removed the handcuffs.

After the handcuffs were removed, Shaw reached into the left front pocket of his sweatpants, and pulled out four brown balls wrapped in plastic. Herrmann took the balls, and Hayes escorted Shaw to the prison's segregated housing unit.

Frederika Laux, a Drug Enforcement Agency analyst, performed tests on the four balls. Laux determined that the

balls contained heroin at a purity level of less than one percent. Because DEA policy prohibited further testing if the balls were shown to contain less than one percent heroin, she did not calculate the exact purity value and did not note the purity value in her report.

On October 23, 2013, a grand jury indicted Shaw for possession of heroin in a federal prison, in violation of 18 U.S.C. §§ 1791(a)(2) and 1791(b)(1). He represented himself *pro se* from his arraignment until his sentencing.

Shaw moved to suppress the four balls recovered during the search, claiming that the search violated his Fourth Amendment rights. The district court denied Shaw's motion, citing *Hudson v. Palmer*, 468 U.S. 517 (1984), when noting that Shaw's claim to privacy rights "cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions."

Shaw then claimed that he was entitled to hard copies of discovery. (The government had given Shaw an electronic copy of the record on a compact disc that Shaw could access using the prison computer room.) Shaw claimed that having only an electronic version of the record hindered his defense, because he could not review the documents in his cell and did not have unlimited access to the computer room; he had to rely on prison officers to escort him to the computer. The district court ruled that providing an electronic version of discovery complied with Federal Rule of Criminal Procedure 16. But the district court offered Shaw the opportunity to review hard copies of discovery at the federal courthouse. Shaw responded, "I object," which the district court interpreted as a refusal.

On March 13, 2014, Shaw moved the district court to disclose the identities of the informants[1] who had called the tip line and informed McDonough that Shaw possessed heroin. Shaw stated doubts about the actual existence of any informants and expressed a desire to "verify their statements" and "cross[-]examine them." Stating that Shaw had not shown that the identity of informants "would be relevant and helpful" to Shaw's defense, the district court denied the motion.

Finally, Shaw requested that a third party, Intermountain Labs in Portland, Oregon, retest the four brown balls. The district court granted Shaw's request at the March 13, 2014, pre-trial hearing, allowing Intermountain Labs both to retest the substance and review the DEA laboratory notes.

Over a month later, at an April 15, 2014, pre-trial hearing, the district court asked Shaw if he had received the results of the test from Intermountain Labs. Shaw claimed that he had not. The district court asked for Intermountain Labs' phone number. After receiving the number, the district court called a recess.

Upon returning from the recess, the district court reported that it had spoken to the administrative assistant for the chemist at Intermountain Labs who was testing the substance. The district court stated that it "didn't ask for the details of the results, if any, but just asked about the process." The assistant had told the district court that a doctor at Intermountain Labs

---

[1] Though we do not know whether the calls to McDonough came from a single informant or two informants, we refer to the callers in the plural.

had spoken to Shaw and informed him about the results of the test, and that Shaw had not requested a report.

In light of this phone call, the district court did not extend the start of the trial past the previously set date of April 21. When asked what witnesses he wished to call at trial, Shaw stated that he wanted the chemist at Intermountain Labs to testify. The district court noted that Shaw had not disclosed the chemist's findings, and Shaw responded that the district court had "broke[n] the attorney-client privilege" by calling Intermountain Labs. The district court said that it had not violated the privilege because it had not learned the results of the test, and had only wanted to "confirm that [Shaw] had received the result" for the sake of determining whether to proceed to trial on April 21.

At trial, Laux testified regarding the findings of her tests. The relevant FCI-Pekin personnel also testified about locating Shaw, the circumstances of the search of Shaw, and the confiscation of the four balls. During his testimony, McDonough specifically described the information provided by the anonymous informants via the tip line; Shaw did not object to this testimony. Shaw also testified. The jury convicted him on April 22, 2014.

The district court sentenced Shaw on August 22, 2014. It agreed with the suggested total offense level of 13, a criminal history category of VI, and the resulting U.S. Sentencing Guidelines range of 33 to 41 months. The district court then sentenced Shaw to 60 months' imprisonment consecutive to his current imprisonment for bank robbery, and three years of supervised release concurrent to the supervised release

imposed in the bank robbery sentence. The district court believed that an above-Guidelines prison sentence was appropriate because of the "nature and circumstances of the offense, the need to protect the public from the defendant, and the high likelihood of recidivism" based on Shaw's history of non-compliance with the law.

Shaw appealed.

Shaw first argues that the government did not present sufficient evidence that he actually possessed heroin. Specifically, he argues that the substance confiscated did not contain a measurable amount of heroin. Because the quantity of the heroin existing in the substance was below one percent, Shaw argues that the government did not introduce a measurable amount of heroin to meet its burden of proof. However, we have never recognized this "minimal purity level defense." *See United States v. Plummer*, 581 F.3d 484, 487–88 (7th Cir. 2009). The purity level in the heroin is inconsequential. *See United States v. Buggs*, 904 F.2d 1070, 1072, 1080 (7th Cir. 1990) (upholding conviction for sale of 9.95 grams of 1.2% heroin); *see also United States v. Marshall*, 908 F.2d 1312, 1316 (7th Cir. 1990) (dilution rate for illegal drugs sold on street, such as heroin, can be 2% to 3% opiate or lower (citation omitted)). If there is evidence of a detectable amount of heroin found in the substance, we will sustain a conviction for possession of heroin.

Here, there was sufficient evidence to convict Shaw of possession of heroin. Laux validated that the balls contained heroin. She testified that the balls, collectively weighing 1.0 grams, "each contained heroin." Laux testified to performing

a color test and gas chromatography. She testified, "Heroin was confirmed in each of those four balls. It is just a laboratory policy that if the purity of the test is less than one percent then it is not reported out because it is a very small amount." This finding of a detectable amount of heroin was sufficient evidence to convict Shaw.

Shaw next argues that the district court erred in denying his motion to suppress the four balls seized after he removed them from his pocket. He claims that he had a reasonable expectation of privacy and that the search violated this expectation and thereby his Fourth Amendment rights. But because Shaw removed the four balls from his pocket before any search occurred, there was no violation of his Fourth Amendment rights.

As a prisoner, Shaw has highly curtailed Fourth Amendment protection. *See Hudson*, 468 U.S. at 527–28 ("A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order."); *King v. McCarty*, 781 F.3d 889, 901 (7th Cir. 2015) (Hamilton, J., concurring) ("those who are detained in connection with proven or suspected criminal activity have sharply diminished expectations of privacy"). Generally, we "give considerable deference to the judgments of prison officials about matters of institutional safety and security." *King*, 781 F.3d at 899 (majority opinion).

Under our precedent, Shaw could only claim that the prison personnel violated his constitutional rights if there were a search that somehow invaded his body. *See id.* at 900 (citation

omitted). But no invasive bodily search of Shaw occurred. Shaw voluntarily removed the balls from his pants pocket before removing his clothes. With no invasion of his body, Shaw's limited Fourth Amendment rights as a prisoner were not implicated.

Shaw next contends that he was entitled to learn the identity of the anonymous tipsters who informed prison personnel that he was carrying heroin. The government has a limited privilege to shield the identity of a confidential informant from a criminal defendant. *United States v. Roviaro*, 353 U.S. 53, 59–60 (1957); *see also United States v. McDowell*, 687 F.3d 904, 911 (7th Cir. 2012). The privilege is stronger for "mere tipsters," who did not participate in the underlying criminal activity, but instead "only … provide [law enforcement] with the relevant information that served as a foundation" for the search. *McDowell*, 687 F.3d at 911 (quotation marks and citation omitted). In deciding whether to disclose an informant's identity, a district court must weigh "the public interest in protecting the flow of information against the [defendant's] right to prepare his defense." *Roviaro*, 353 U.S. at 62. The privilege remains unless the defendant establishes that the informant's identity "is relevant and helpful to [his] defense … or is essential to a fair determination of a cause." *Id.* at 60–61; *see also United States v. Harris*, 531 F.3d 507, 514 (7th Cir. 2008) (citations omitted) (defendant has burden of overcoming privilege).

Here, Shaw has not established that the privilege of anonymity must give way. First, nothing suggests that the anonymous informants participated in the underlying criminal activity; there is no evidence that the informants had anything

to do with Shaw possessing heroin. They were "mere tipsters," and the privilege of anonymity is stronger. *See McDowell*, 687 F.3d at 911. Also, the presumption of anonymity is higher still when applied to a prison setting, where an inmate offering a tip to correctional personnel may fear reprisal. Without the protection of anonymity, prisoners may never provide tips. Shaw did not offer a meaningful counter-argument, and the district court did not abuse its discretion in denying his motion to disclose the identity of the informants.

Shaw also argues that Lieutenant McDonough's testimony about the statements of the anonymous informants constituted inadmissible hearsay. McDonough testified that during the first phone call on the anonymous tip line, the informant told him that "Shaw was in possession of heroin." He also testified that during the second phone call, the informant told McDonough that Shaw "was definitely carrying heroin."

McDonough's statements were not inadmissible hearsay; the district court could have admitted the statements as non-hearsay because they either demonstrate the effect on the listener or discuss the course of the investigation. First, the statements of the informants could have been admitted to show the effect on the listener, McDonough; the statements had the effect of causing McDonough to direct other FCI-Pekin personnel to find and search Shaw. Second, the district court could have admitted the statements under the "course of investigation" rationale. *See United States v. Cruse*, 805 F.3d 795, 810 (7th Cir. 2015). This is essentially an extension of the "effect on the listener" principle to law enforcement: "[W]hen such a statement is offered only to show the effect that it had on the police, it is used for a purpose other than the truth of its

contents." *Carter v. Douma*, 796 F.3d 726, 736 (7th Cir. 2015) (citation omitted). The statements could have been admitted to show that FCI-Pekin personnel did not randomly accost Shaw, and that they were led to investigate him because of calls from the anonymous informants.

Whatever the rationale, Shaw suffered no prejudice. *See United States v. Haldar*, 751 F.3d 450, 458 (7th Cir. 2014). He had heroin on his person and presented no evidence that someone planted heroin on him.

Shaw next argues that the district court violated his work product privilege by speaking to the Intermountain Labs employee about the results from the second test of the substance in the four balls. Because he was *pro se*, Shaw was afforded an attorney's privilege to "prepare his legal theories and plan his strategy without undue or needless interference." *United States v. Nobles*, 422 U.S. 225, 237 (1975) (citing *Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (quotation marks omitted)); *see also United States v. Smith*, 502 F.3d 680, 689 (7th Cir. 2007). But the district court did not interfere with this privilege. The district court never learned the results of Intermountain Labs' test; it merely learned that the test had actually occurred. Without knowing the test results, the district court could not have learned about or interfered with Shaw's legal theories or strategy regarding the test. Having not interfered with Shaw's theories or strategy, the district court did not violate Shaw's work product privilege.

Shaw's final evidentiary argument is that the district court erred in not requiring the government to provide hard copies of discovery to him that he could have reviewed in his cell. He

claims that providing him only an electronic copy of the pre-trial record via compact disc was insufficient because he had limited access to the FCI-Pekin computer room.

We are deferential to the district court on such evidentiary matters; any preference of the appellate court is not binding. *See United States v. Abair*, 746 F.3d 260, 269 (7th Cir. 2014) (citation omitted). Shaw may not have had unfettered access to the prison computer room, but he still had sufficient opportunity to review the record on the compact disc. Further, the district court offered Shaw the opportunity to view the hard copies of the record in the courthouse, but Shaw rejected the offer. The district court did not abuse its discretion in denying Shaw hard copies of discovery.

Finally, Shaw argues that his above-Guidelines sentence of 60 months' imprisonment, to be served consecutive to his bank robbery conviction, was unreasonable. District courts have "wide discretion in determining what sentence to impose." *United States v. Tucker*, 404 U.S. 443, 446 (1972); *see also Narvaez v. United States*, 674 F.3d 621, 626 (7th Cir. 2011). We will not disturb a district court's sentence unless it is procedurally or substantively unreasonable. *See United States v. Black*, 815 F.3d 1048, 1051 (7th Cir. 2015) (citations omitted). Here, the district court committed no procedural error, and the sentence, while above the Sentencing Guidelines range, was substantively reasonable.

Shaw claims that the district court committed procedural error by "not explain[ing] why the recommended [G]uidelines range was inadequate." This is not a procedural requirement for a valid sentence. A sentencing court commits procedural

error only if it "calculates the [G]uidelines incorrectly, treats the [G]uidelines as mandatory, fails to consider the 18 U.S.C. § 3553(a) factors, or inadequately explains the chosen sentence." *United States v. Schlueter*, 634 F.3d 965, 967 (7th Cir. 2011) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)) (other citation omitted). The district court did none of these things, and therefore did not commit procedural error.

Shaw's sentence is also substantively reasonable. The district court calculated the Sentencing Guidelines range to be between 33 and 41 months' imprisonment, yet ultimately sentenced Shaw to 60 months' imprisonment. We do not presume this sentence unreasonable "simply because it is above the Guidelines range." *United States v. Bour*, 804 F.3d 880, 886–87 (7th Cir. 2015) (citations omitted). Instead, we will affirm such a sentence "so long as the district court offered an adequate statement of its reasons, consistent with the 18 U.S.C. § 3553(a) factors." *United States v. Abebe*, 651 F.3d 653, 657 (7th Cir. 2011) (quotation marks and citation omitted). While "[a] major departure [from the Sentencing Guidelines range] requires a more significant justification," the district court "need not provide an *extraordinary* justification." *United States v. Pabey*, 664 F.3d 1084, 1098 (7th Cir. 2011) (emphasis added) (citations omitted).

Here, while the district court's sentence was a major departure from the Sentencing Guidelines range, the district court gave a sufficiently adequate explanation for the departure. The district court related the sentence to Shaw's present offense, noting that "heroin puts so many at risk including prison staff and other inmates" and that such drugs "could result in violence." It also detailed Shaw's ongoing criminal

history, repeated "failure to comply … with conditions of parole and supervised release," and "non-compliance while in custody," which included "seven violations resulting in disciplinary actions." The district court also emphasized Shaw's marked recidivism, saying at one point, "Incarceration hasn't or doesn't motivate you to refrain from criminal conduct and any motivation to change seems nonexistent." It then sentenced Shaw in an effort to "[p]romote respect for the law[,] provide just punishment, afford adequate deterrence to criminal conduct[,] and protect the public from further crimes," in addition to other 18 U.S.C. § 3553(a) factors. This thorough explanation justified imprisoning Shaw for 60 months and renders the above-Guidelines sentence substantively reasonable.

We AFFIRM Shaw's conviction and sentence.